Lawrence ROSENBLOOM, Plaintiff,

v.

ADAMS, SCOTT & CONWAY, INC., and Asher Schapiro, Defendants.

No. 77 Civ. 5687 (IBC).

United States District Court, S. D. New York.

Sept. 2, 1981.

Schwarzfeld, Arnoff & Shire, New York City, for plaintiff; Neal Schwarzfeld, Franklin D. Ormstem, New York City, of counsel.

Carpenter, Bennett & Morrissey, Newark, N. J., for defendants; Robert E. Turtz, Newark, N. J., of counsel.

## OPINION

IRVING BEN COOPER, District Judge.

This action, tried to the Court,[1] involves fourteen (14) claims for relief asserted by plaintiff, and one counterclaim raised by defendants. Plaintiff's claims involve: (1) securities fraud; (2) common law fraud; (3) breach of contract; (4) breach of oral employment contract; (5) assumption of several promissory notes; and (6) monies and personal belongings owing to plaintiff. Defendants' counterclaim alleges that the plaintiff is liable for misrepresentation.[1a]

The essence of this action centers around the dealings of two men, plaintiff Lawrence Rosenbloom and Asher Schapiro (Schapiro), one of the defendants, over a four year period. Between 1971 and 1974, plaintiff's and Schapiro's respective insurance agencies merged, and a new agency, Adams, Scott & Conway, Inc. (ASC) was created in the hope that a nationwide network would eventuate. Efforts were undertaken and money raised to achieve this goal. However, plaintiff's and Schapiro's business dealings came to an abrupt end when plaintiff's employment with ASC was terminated in October, 1974.

---

1. For the first time, defendants, in their post-trial brief, seek to amend their pleadings to include a new counterclaim for breach of a non-competition agreement. We deny that application. See *infra*.

1a. The issues of liability and damages were severed. The liability issue only was tried.

## The Facts

### a. Negotiations between the parties

In 1969 plaintiff was the owner of two-thirds of the capital stock of Lawson, Stewart & McCory (LSM), an insurance agency headquartered in Los Angeles, California, with affiliated branch offices in other cities. LSM dealt primarily in various forms of commercial insurance, workmen's compensation and group insurance plans; life insurance was not a major feature of the business.[2] Plaintiff was primarily involved in the marketing aspects of the business, while Warwick Feldman, owner of the remainder of LSM's stock, dealt with the day to day operations of the agency.

Plaintiff testified that LSM was in need of cash in 1970 because of an overly rapid expansion of its business.[3] One of the contemplated plans was to raise the needed capital through a merger with another company. In 1970 and 1971 plaintiff spoke to several persons including Schapiro and company representatives regarding potential investments or mergers.[4]

Schapiro was then the principal shareholder of Scott Brokerage Limited (SBC) which dealt primarily in life insurance and did business almost exclusively in the greater New York City region.[5] During 1970 and 1971 Schapiro considered and gradually concluded that it would be beneficial to the company and himself if the operational and geographical scope of his company was expanded.[6] In those two years, Schapiro, with the help of Sidney Staunton, Chairman of the Board of Laird, Incorporated, a New York investment banking firm, examined several alternatives for expansion.[7] One of the alternatives Schapiro considered was a merger with LSM.

It is unclear from the record when plaintiff and Schapiro first met to discuss a potential merger of their respective companies. However, in the early part of 1971 several discussions were held between plaintiff, Schapiro and Feldman. By the summer of 1971, discussions concerning a merger became frequent.

Beginning in June or July of 1971, Schapiro was provided with information concerning LSM's financial condition and became familiar with the general financial and working operations of that agency. He received, among other documents, a consolidated profit and loss statement and an evaluation of LSM by an independent concern.[8] Schapiro testified that during this period he spent a "fair amount" of time at the offices of LSM in California and was never refused a document.[9]

Both plaintiff and Feldman testified that they told Schapiro about the financial difficulties LSM was encountering, including its "out-of-trust position."[10] Plaintiff testified LSM had used premiums collected from its customers, and due insurance companies, to cover the company's operating expenses; that Schapiro knew the difficulties LSM was having and knew it was "out-of-trust."[11]

It is unclear from the trial record what the actual extent was of Schapiro's involvement with LSM during the summer and fall of 1971. Plaintiff testified that as of August, 1971 Schapiro was continually in-

---

**2.** T.T. 116 ("T.T." refers to trial transcript).

**3.** T.T. 156–57.

**4.** T.T. 169–70.

**5.** T.T. 2174.

**6.** T.T. 2173–74.

**7.** T.T. 2173–75.

**8.** T.T. 2184–86; Ex. 1 (hereinafter plaintiff's exhibits are referred to by number and defendants' by letter).

**9.** T.T. 2313; Ex. 160, p. 81.

**10.** T.T. 197–98; 489–90. As the term was used at trial, "out-of-trust" refers to the situation where an insurance agency collects premiums from customers and instead of forwarding this money to the insurance carrier to whom it is due, the agency uses it for its own purposes, e. g. to cover operating expenses. How and when the insurance carrier eventually received its portion of the premiums has not been disclosed to us.

**11.** T.T. 257–58; 2312.

volved in the day to day operations of LSM; that no LSM check for payment would be issued without Schapiro's approval. Schapiro, to the contrary, testified that during this period he was not involved in the daily operations of LSM.[12] It is clear, however, that Schapiro did raise capital for LSM in that period; that in September, 1971 he arranged for a loan of $100,000 to be made to LSM from one of his friends, Adolph Biefeld.[13]

Initially, the discussions among the three parties (plaintiff, Schapiro and Feldman) centered on a possible three way merger between LSM, SBC, and the CFC Financial Corp. (CFC) (Schapiro was president of the company last named). CFC among other enterprises had a subsidiary in the casualty and property phase of insurance. In furtherance of these discussions a memorandum of intent was prepared.[13a] No merger ensued because CFC's board of directors considered LSM's financial position weak and were concerned about the alleged questionable reputation plaintiff and Feldman had in the industry.[14]

Schapiro took the contrary position and felt a merger with LSM was a good opportunity. He, plaintiff and Feldman then considered a two way merger between SBC and LSM. Schapiro testified that in the discussions which ensued he made his conditions for approval known: (1) he would be chief executive officer of the new company; (2) he would receive 50% of the stock; and (3) each of the three parties would be treated equally as to benefits, salaries and respective shareholdings.[15]

Likewise, plaintiff made his intentions and goals clear: (1) improve the financial condition of LSM; (2) be relieved of certain personal liabilities he had on loans he had undertaken for LSM; (3) stay in financial control; and (4) be a partner in the new entity.[16]

At the time of the merger discussions between SBC and LSM in 1970 and 1971, plaintiff was indebted to the extent of $25,000 to Ruta Lee, a long time family friend. Even though the note was cast in the form of a personal loan to plaintiff and his wife, plaintiff testified all concerned understood the note was for LSM's use;[17] that Schapiro represented to him that the new company would pay this obligation.[18] Lee testified that in 1971 Schapiro said ". . . he was taking care of everything and that he would personally see to it that this loan was repaid."[19]

Schapiro admitted that he had spoken to Lee in regard to the note, but that he only said that "somehow" the note would be repaid if the new company became financially stable.[20]

At about the same time, plaintiff was also personally indebted to his in-laws, Irving and Beatrice Citron, for approximately $26,500. That loan also on its face was a personal one to plaintiff and his wife, but plaintiff testified that this note too was to be used by LSM;[21] that Schapiro and Mrs. Citron met in 1971 and Schapiro told her that plaintiff's debt to her would be paid off from the new financings of the company.[22] Schapiro, on the other hand, testified that he met Mrs. Citron, but denied discussing the note with her.[23] At her deposition Mrs. Citron testified: "Q. You mentioned Asher Schapiro in your testimony. Do you know Mr. Schapiro? A. Yes. Q. When did you first meet him; do you recall? A. At a

12. T.T. 2311.

13. T.T. 2195–97.

13a. Ex. 8.

14. T.T. 2190–93.

15. T.T. 2200; 2206; 2207.

16. T.T. 219; 220; 474.

17. Ex. 58. This note was dated July 9, 1968.

18. T.T. 221.

19. T.T. 29.

20. T.T. 2271.

21. T.T. 798–99; Ex. 63.

22. T.T. 800–02.

23. T.T. 2270.

restaurant. I was with Stephanie and Larry and we all had dinner together. . . . Q. Do you recall whether that was before or after Mr. Rosenbloom and Mr. Schapiro began working their businesses together? A. Before. Q. Did you ever discuss with Mr. Schapiro the obligation or the loans you had made to Mr. Rosenbloom? A. Did I ever speak with Asher? No. Q. At any time? A. No." [24]

This sharp conflict in sworn testimony on the Lee and Citron notes is but one of the many examples, throughout the trial record, which dealt with key factual issues confronting us; clear contradictions, uncertainty, unpersuasiveness characterized each. We feel duty bound to delve quite considerably (throughout this opinion) into such instances; in the main, they account for our estimate of the proof adduced.

At the time of the merger of LSM and SBC, LSM was also indebted to City National Bank of Beverly Hills, California for $150,000. Plaintiff had secured this note with personal assets, and it was repaid in 1972.[24a] LSM again borrowed $150,000 from City National Bank in September, 1972. Both plaintiff and Schapiro gave personal guarantees on this note, guarantees which could be revoked once the note was repaid. It was repaid in October, 1972.[24b]

In the fall of 1971, steps were undertaken towards a contemplated public financing— the vehicle which plaintiff, Schapiro and Feldman considered essential to raise the capital to meet LSM's financial needs and provide the necessary funds for nationwide expansion. To this end, Schapiro retained the services of Richard A. Eisner & Co., certified public accountants, to review LSM's books. They reported the books were not certifiable. Counsel retained for the public offering advised Schapiro that because LSM's financial records were inadequate the Securities and Exchange Commission would not approve an underwriting for it.[25] To overcome this problem, a plan was devised to create a new and separate corporation, one which would eventually take over the business of LSM and SBC.

The new plan was adopted and consummated during the latter part of 1971 and early part of 1972. First, in December, 1971 there was a merger between SBC and LSM, with the latter the surviving entity. As a result of this merger Schapiro owned 50% of LSM's stock, plaintiff 33⅓% and Feldman 16⅔%.[26] As plaintiff testified, this division of stock was agreed upon because it reflected the past contribution of the parties to their respective companies as well as their respective efforts towards future similar contributions to the new company.[27]

Next, LSM distributed all of its stock in its wholly owned subsidiary, Professional Insurance Administrators (Professional) to the parties in the same proportion as their holdings in LSM. Simultaneously, the three parties contributed their stock in Professional to a newly formed Delaware corporation, PIA, Inc. in exchange for PIA stock.[28] The net result of this final transaction was that each participant held stock in PIA as follows: Schapiro 45%; plaintiff 30%; Feldman 15%; and Staunton 10%.[29] After a series of name changes, PIA, Inc. became known as Adams, Scott & Conway.

Despite plaintiff's desire to remain a partner in ASC, he was discharged in October, 1974. The proof adduced at trial concerning the termination of plaintiff's position is likewise unclear and confusing. Defendants assert that his post was terminated for cause. To this end, defendants introduced evidence of several of plaintiff's busi-

24. Deposition, Beatrice Citron, November 6, 1973, p. 13.

24a. T.T. 756–57.

24b. T.T. 764–65; Exs. 52, 53, 54.

25. T.T. 2209–10.

26. Ex. 18.

27. T.T. 313.

28. Ex. 17.

29. Staunton received these shares in consideration of his organizational and promotional efforts for the company.

ness practices and difficulties to which defendants objected. For example, Hjelm, a vice-president of ASC who worked with plaintiff in California between April, 1972 and April, 1973, testified that he observed plaintiff's performance and objected to several of his practices in that: (1) plaintiff charged the company for personal expenses; (2) plaintiff failed to secure needed information in connection with insurance applications; (3) plaintiff was not a good collector of accounts; (4) company funds were used to cover overdrafts in plaintiff's personal accounts; and (5) plaintiff wrote off substantial numbers of credit balances—money owing to customers.[30]

Hjelm further testified that ASC was concerned with legal proceedings brought by John Hancock Mutual Life Ins. Co. in 1972; that LSM had never forwarded funds owing to Hancock with the result that Hancock commenced legal proceedings and the action was eventually settled. Hjelm's testimony included the assertion that the California insurance commissioner in 1973 investigated plaintiff's business practices and that Hjelm in support of plaintiff met with the commissioner in an effort to persuade him not to revoke plaintiff's license.[31]

Hjelm concluded his testimony with the assertion that the main factor ultimately crucial to the discharge of plaintiff was his lack of productivity;[32] that theretofore he had spoken to Schapiro of it; that Schapiro recognized it and wanted to try to motivate plaintiff by giving him a title; that in late 1973 a meeting was held between Schapiro, plaintiff and several other employees of ASC at which plaintiff was made senior vice-president of marketing for ASC.

Addressing himself to what he considered other bad business practices by plaintiff and warranting his discharge, Schapiro testified that: (1) plaintiff failed to execute guarantees in connection with financing efforts;

(2) disregarded the company's expense policies; and (3) failed to disclose the true extent of LSM's financial difficulties.[33]

Plaintiff's sole response was a denial that he was fired for cause and included a naked refutation of the points defendants raised; he asserted that the real reason for his discharge was the fact he was no longer needed for refinancing arrangements.[34]

Plaintiff spends many pages in his memorandum (post-trial) comparing his practices and use of company funds with Schapiro's and asserts that he, plaintiff, was singled out for unfavorable treatment.[35] It is clear that from at least 1972 plaintiff understood that Schapiro was to be the chief executive officer of the company whose efforts would be primarily devoted to raising capital for the company. Comparing the expenses which plaintiff spent bringing business to ASC with those which Schapiro incurred raising funds (necessitating several overseas trips), is simply not realistic. Their individual functions were different and of necessity the expenses related thereto are not comparable.

The actual circumstances which led to the firing of plaintiff are unclear. In late October, 1974 a meeting was held in the California offices of ASC attended by plaintiff, Schapiro, P. Hjelm and Men Levi, the manager of the Los Angeles office. What exactly was said at this meeting is ambiguous. Plaintiff testified that he stated his discontent and that perhaps the merger was not a good venture because the company was in no better financial position than before the merger.[36]

On October 22 or 23, 1974 plaintiff met with Levi in the latter's office. Levi asked for plaintiff's resignation. Plaintiff testified that he was absolutely shocked at this occurrence and told Levi he would not resign. Levi then told him he was fired as of

---

**30.** T.T. 1742–43; 1749–50; 1754–55; 1759–60; 1762–70; 1854–55.

**31.** T.T. 1779–97; 1810–12.

**32.** T.T. 1865–67.

**33.** T.T. 2244–46; 2267–68.

**34.** Plaintiff's Post-Trial Memorandum, p. 61.

**35.** *Id.* at 70–72.

**36.** T.T. 732–39.

"right now." [37] Schapiro testified that he had given Levi the authorization to discharge plaintiff, but left the details to Levi's discretion.[38]

\* \* \* \* \* \*

Plaintiff's first three claims for relief arise out of the same factual allegations of fraud by the defendants. Plaintiff claims that Schapiro, in his individual capacity and as agent for ASC, knowingly made certain untrue representations to plaintiff as hereinabove outlined in connection with the transfer of his Professional stock for ASC shares, to wit: (1) plaintiff would be employed on equivalent terms with Schapiro; (2) Schapiro would fulfill his obligations as represented in a letter of intent signed by both plaintiff and Schapiro (exhibit 18); and (3) plaintiff would be relieved of personal liability on the City National Bank, Lee and Citron promissory notes. Claim 1 is based on Rule 10b–5, 17 C.F.R. § 240.10b–5; claim 2 on *Cal.Corp.Code* § 25401 (West), an antifraud provision; claim 3 on California common law fraud.

Our analysis of the issues raised by these three claims necessitates an examination of the entire course of dealings between plaintiff and Schapiro from the time they first met to after the date plaintiff was discharged from ASC in October, 1974. Many of the issues raised here relate to all the other separate but interrelated claims asserted in this action by plaintiff. Accordingly, our disposition of those other claims, discussed hereinafter, is pertinent to these three claims as well.

■ To sustain a private action for damages under Rule 10b–5, the plaintiff must establish the following essential elements: (1) defendants used the mails, or an instrumentality of interstate commerce, in connection with the purchase or sale of a security; (2) that in connection with the purchase or sale, defendants employed a device, scheme, or artifice to defraud, or made an untrue statement of a material fact, or omitted to state a material fact necessary in order to make the statements in light of the circumstances under which they were made not misleading, or engaged in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person; (3) that the defendants had the requisite "scienter"; (4) that the plaintiff relied on the statements of defendant; and (5) that plaintiff suffered damage as a result. See *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968) (en banc), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5.

■ The elements of fraud under California common law are very similar:

A cause of action for fraud is proven where the evidence discloses (1) the making of a false representation of a material fact; (2) that defendant either knew the statement was false, or lacked an honest belief in its truth, or that the statement was carelessly made, in a manner not warranted by the information possessed by defendant; (3) that it was made with intent to induce reliance by plaintiff; (4) that it was justifiably relied on by plaintiff, and (5) plaintiff suffered damage thereby.

*Gagne v. Bertran*, Cal.App., 264 P.2d 641, 645 (Cal.Dist.Ct.App.1953) (citations omitted), *rev'd on other grounds*, 43 Cal.2d 481, 275 P.2d 15 (Cal.Sup.Ct.1954).

■ Under both Rule 10b–5 and common law fraud, plaintiff must prove that the defendants made an untrue or false statement of material fact. As to the alleged representation by Schapiro that plaintiff would be relieved of personal liability on the Lee and Citron notes, we can not conclude from the total trial record that this representation was made. The evidence adduced was conflicting and unconvincing. As to the Lee note, she and plaintiff testified that the Schapiro promise was made. Schapiro denied this. As to the Citron note, plaintiff's mother-in-law completely contra-

---

**37.** T.T. 739–42.

**38.** T.T. 2265–68.

dicted plaintiff's own testimony. Considering the confusion in the record and the contradictions in plaintiff's testimony, we are not convinced and find that Schapiro did not represent to plaintiff that he would be relieved of personal liability on these notes.

As to the representation by Schapiro that plaintiff would be relieved of liability on the City National Bank note: That note was in fact paid by LSM. Plaintiff admitted that the City National Bank indebtedness which existed when LSM and SBC were merged was paid in October, 1972. It is true that plaintiff had signed a continuing guarantee with the bank, but once the note was paid, plaintiff was free to revoke the guarantee—it was plaintiff's own decision to remain personally liable on the other notes issued by LSM in 1973. Here again we find the proof offered to sustain the contention unconvincing.

The remaining representations which plaintiff claims were made involved his relationship with Schapiro and his continued role with the new company. Specifically, plaintiff alleges that Schapiro promised he would fulfill his obligations as evidenced by the letter of intent (exhibit 18)—that plaintiff and Schapiro would be employed on equivalent terms.

To support his contention that Schapiro made these representations with no intent to fulfill them, plaintiff argues that several occurrences are probative: (1) defendants did not offer plaintiff an employment contract in 1972 even though Schapiro had one; (2) defendants' bad faith dealing with plaintiff in 1973 concerning employment and equalization agreements; (3) Schapiro's execution of LSM notes to Lee and the Citrons in 1974 when he knew LSM was unable to repay them; and (4) defendants reneged

on these notes once Rosenbloom was discharged in 1974.

Plaintiff rightfully points out that it is impossible for us to probe Schapiro's mind for any direct evidence of intent or state of mind at the time when these representations were made. We can only view what transpired from hindsight and where possible draw our own inferences from the credible proof adduced.

We find that plaintiff has failed to convince us by a fair preponderance of the credible evidence that Schapiro made these representations with knowledge of their falsity or made carelessly or recklessly. The trial record contains evidence that Schapiro intended to carry out his promise. For instance, plaintiff was offered employment contracts by Schapiro in 1973 and 1974 and had several discussions with Schapiro concerning the same as early as 1972. Plaintiff was also offered by Schapiro an equalization agreement in 1973, but refused to sign it because he would not accept equal burdens with Schapiro. Further, plaintiff admitted that while he was employed by ASC he received the same salary, benefits and terms of employment as Schapiro. He was also a member of the board of directors and a senior vice-president of ASC.

Plaintiff asserts that his eventual discharge from employment is strongly probative of Schapiro's bad intent. We are not prepared to so conclude. Plaintiff's termination occurred approximately three years after the date that the alleged representations were made. The record is replete with evidence of circumstances (not present in 1970 and 1971) which tend to prove that defendants became displeased with plaintiff's performance only after the passage of a number of years.[39]

---

**39.** Plaintiff did not argue his second claim in his post-trial memorandum. Even if plaintiff had argued his second claim, the same result would obtain. *Cal.Corp.Code* § 25401 and its corresponding damage provision, *Cal.Corp. Code* § 25501, have been construed by California courts as not being a strict liability statute. *Bowden ·v. Robinson*, 67 Cal.App.3d 705, 136 Cal.Rptr. 871, 878–79 (Ct.App.1977). *Cal.Corp.*

*Code* § 25501 provides that a defendant is not liable if he can prove that he exercised reasonable care and did not know of the untruth or omission. Because we have concluded that Schapiro did not make any of the representations with knowledge of their falsity, or in any sense carelessly, *a fortiori* Schapiro is absolved of any liability based on this statute.

As one California court has stated:

A declaration of intention, although in the nature of a promise, made in good faith, without intention to deceive, and in honest expectation that it will be fulfilled, even though it is not carried out, does not constitute a fraud.

*Church of the Merciful Saviour v. Volunteers of America, Inc.*, 184 Cal.App.2d 851, 8 Cal.Rptr. 48, 53 (Dist.Ct.App.1960) (citations omitted).

*See Ernst & Ernst v. Hochfelder, supra; Gagne v. Bertran, supra; Cal.Civ.Code* § 1572 (West). *See also* W. Prosser, *Law of Torts* 700–03, 714–15 (4th ed. 1971).

b. The letter of intent

In January, 1972, plaintiff, Schapiro and Feldman met in New York to discuss the proposed public financing for ASC, the new company. Plaintiff testified that at one of these meetings he stated that he wanted to memorialize his understanding as to the relationship and relative standings of the three parties.[40] To this end, at a meeting held on January 21, 1972, discussions were held concerning these matters; counsel to ASC was directed to draw up a document reflecting the understanding of the parties. At that same meeting the document was prepared and denominated a letter of intent.[41] It detailed, among other matters, the relative position and salary the three parties would have in the new company. The remaining provisions of the document provided: (1) plaintiff, Schapiro and Feldman would at all times vote their shares to elect the others as members of the board of directors; (2) all decisions relating to LSM and ASC would be made upon agreement of the three parties, but in the event no agreement resulted Schapiro would have final say; (3) as members of the board of directors of LSM and ASC, the parties would vote Schapiro as chief executive officer and chairman of the board, plaintiff as president, and Feldman as vice-president in charge of operations; and (4) the three parties would vote to pay each other $50,000 annual compensation.

The terms of the document were conditioned on the availability of the respective parties for full performance of their respective duties, and not in default under any employment agreement. It finally provided that the parties would execute agreements to effectuate the intent expressed in the document.

Once the letter of intent was prepared, plaintiff and Schapiro signed it. When it was presented to Feldman, he refused to sign it.

As to the circumstances and reasons for Feldman's reluctance, we are again left with a conflicting, confusing, and contradictory record. Feldman stated that he would not sign it because by its terms Schapiro was to be the chief executive officer of the new company and the new headquarters of the company were to be located in New York instead of California. Feldman testified that this was not in accordance with his previous understanding of their proposed arrangements; that when his position was conveyed to Schapiro, Schapiro said that it was "a take it or leave it situation," and that the merger talks would be discontinued if Feldman did not sign the document.[42]

Schapiro's recollection of this meeting was that Feldman only stated that before he would sign the document, he wanted to have counsel in Los Angeles review it.[43] Plaintiff, for his part, testified that at this meeting Feldman stated he had lost faith in Schapiro and would not sign the document; that he, plaintiff, told Feldman Schapiro should be trusted and that Schapiro tried to dissuade Feldman from his decision.[43a]

Schapiro testified that after this meeting concluded, he learned from plaintiff for the first time that Feldman would not sign the document; that Feldman's expertise in the property and casualty phase of the insurance business was important to the original

**40.** T.T. 334–35.

**41.** Ex. 18.

**42.** T.T. 513–16.

**43.** T.T. 2213.

**43a.** T.T. 344–49.

concept of merging the companies and that Feldman's failure to sign the document threatened the contemplated public financing. Schapiro further testified that plaintiff later informed him that Feldman would stay on with the company so that the public financing could be completed, but he would then resign from the company.[44] This, Schapiro testified, was unacceptable and since Feldman expected to abandon an active role in the company, "... that the whole deal would have to be re-evaluated in terms of [what] the various equities were going to be and who the principals [were] going to be." [45] Thereafter Feldman resigned from ASC but remained as a consultant under contract for two or three years.[46]

\* \* \* \* \* \*

Plaintiff asserts in his fourth claim for relief that the letter of intent (exhibit 18) signed by him and Schapiro is a valid and binding agreement. Defendants argue that plaintiff and Schapiro did not intend to be bound by this letter because Feldman failed to agree to its terms; alternatively, even if the letter of intent is a valid contract, it is an improper attempt to bind the discretion of the board of directors of ASC and therefore invalid under Delaware law.[47]

The cornerstone of any contractual agreement is that the parties mutually assent to its essential terms. The precise question which we are presented with here is whether plaintiff and Schapiro intended to be bound by the terms of the letter of intent in the absence of Feldman's acceptance.

The general rule has been stated authoritatively:

When the contracting parties are found to have intended to reduce their agreement to a single complete writing and not to be bound by their antecedent communications, it will usually be found also that they intend not to be bound *until the writing has been signed by everyone of them.*

1 Corbin, *Contracts* § 31 (1963) (emphasis added).

However, where the parties may have expressed a contrary intention, or when it is clearly understood that those who signed the contract will be bound, the absence of one or more signatures will not preclude the finding that a valid agreement has been entered into by the signatories. *See Schutzman v. Gill,* 154 A.2d 226, 229 (Del.Ch.1959). *See generally Willard F. Deputy & Co. v. Hastings,* 123 A. 33, 34–35 (Del.Super.Ct.1923).

In the present case we find that based on the total proof adduced at trial, plaintiff and Schapiro did not intend to be bound by the terms of the letter of intent.

First, in all of the discussions and dealings which led up to the preparation of the letter of intent, it was clearly understood that all three parties would have active and specific roles in the new venture. The document itself reflects that. Second, the document was first signed by plaintiff and Schapiro and only then was it presented to Feldman. There was no evidence that plaintiff and Schapiro signed the document after learning that Feldman would not agree. Third, even if we were to find this document was a valid agreement between plaintiff and Schapiro, the letter of intent by its own terms was conditional and this condition had not been met. It reads:

All of the foregoing voting agreements are conditioned on the respective individuals being available for duties, and not in default under any employment agreement or otherwise. . . .

Clearly, Feldman's resignation from the company and abandonment of an active role in the company as envisioned by plaintiff and Schapiro, renders the document void on its own terms. *See generally* 3A Corbin, *Contracts* §§ 739–41 (1960).

**44.** T.T. 2215–17.

**45.** T.T. 2218.

**46.** T.T. 545.

**47.** We need not decide the question involving Delaware law since we find that the letter of intent is not a binding contract and therefore unenforceable.

## c. 1973 financing efforts

█ The plan above mentioned for public financing of the new company was ultimately abandoned in favor of private financing. Finally, E. Stableford & Co., a British concern, agreed to provide the necessary funds. Stableford also agreed to provide some interim financing, but as a prerequisite insisted that plaintiff and Schapiro give their personal guarantees.[48] Plaintiff refused, stating that he was already personally liable on several loans, and did not want to increase his indebtedness.[49] Nevertheless, after Peter Hjelm, a vice-president of ASC, gave his personal guarantee to Stableford the interim financing arrangements were consummated. Stableford agreed to invest a substantial amount of capital in ASC on a permanent basis on the additional condition that both plaintiff and Schapiro return half of their stock holdings in ASC.

What then ensued, facts which are critical to several of plaintiff's claims, is not clear. Again we are presented with conflicting testimony which makes it impossible for us to adduce from the trial record what in truth occurred. Plaintiff testified that in the middle of August, 1973 during a telephone conversation with Schapiro, he first learned that Stableford wanted him to return half of his stock. Since Schapiro was also returning half of his stock, he had no objections. He also testified that he relied on Schapiro's statements that the stock would eventually come back to them in the form of favorable stock options from ASC; that he asked Schapiro to take care of the matter of his employment and equalization agreements, thereby documenting his and Schapiro's understanding that they would be equals in ASC, regardless of title and function as to salary, stock holdings and employment contracts; and that they would run the corporation as partners. He then testified that Schapiro said he would take care of the matter.[50]

Schapiro testified that the matter of returning half of the shares was discussed at a board of directors meeting of ASC in June, 1973 at which plaintiff was present; that he proposed returning half his shares as an incentive to Stableford to make the investment; that plaintiff at first refused, then asked to leave the room for a few minutes to think it over; that he, Schapiro, spoke to plaintiff and told him if he did not return the shares, it would not make any difference because the shares would be worthless; and that plaintiff returned to the meeting and said he would "most likely" go along.[51] Subsequent to this meeting, plaintiff did in fact agree to return the shares in question.[52]

\* \* \* \* \* \*

In claims 5, 6 and 7, plaintiff asserts that when he agreed to return half of his ASC stock in 1973 he relied upon the following representations made by Schapiro: (1) plaintiff's interest in ASC would remain "coextensive" with Schapiro's; (2) plaintiff would remain an integral part of ASC; and (3) plaintiff would receive an employment contract. Plaintiff further alleges that these representations were untrue when made. Claim 5 is based on Rule 10b–5; claim 6 on *Cal.Corp.Code* § 25401;[53] and claim 7 on California common law fraud.

The only affirmative evidence on these claims came from plaintiff's testimony. Schapiro denied making these representations and testified that the only conversation he had with plaintiff relating to the return of half of plaintiff's shares was that he told plaintiff if he did not do so, the shares would become worthless.

As our own Circuit Court has stated:

Wherever the burden rests, he who undertakes to carry it must do more than create a doubt which the trier of fact is

---

48. T.T. 2247; 2248–56.

49. T.T. 2256.

50. T.T. 692–95.

51. T.T. 2249–52.

52. Ex. BQ.

53. As with claim 2, plaintiff has failed to offer any legal analysis on this claim.

unable to resolve * * * 'If the determination of this question is left in doubt, that doubt must be resolved against' the [one who carries the burden].

*Diesel Tanker F. A. Verdon, Inc. v. Stakeboat No. 2*, 340 F.2d 465, 467 (2d Cir. 1965) (citing *Commercial Molasses Corp. v. N.Y. Tank Barge Corp.*, 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89 (1941)). See *Texas Distributors v. Local Union No. 100*, 598 F.2d 393, 402 (5th Cir. 1979); *N.L.R.B. v. Patrick Plaza Dodge, Inc.*, 522 F.2d 804, 809 (4th Cir. 1975).

Once again plaintiff has only created a doubt in our minds; the bare evidence before us falls short of conviction as to defendants' misrepresentations asserted in claims 5, 6 and 7.

### d. Employment contract

By his own admission, plaintiff was concerned, from the date of the pre-merger negotiations throughout his association with ASC, about his own job security and his position in the company as it related to Schapiro's. To this end, plaintiff demanded an employment contract and an equalization agreement guaranteeing that his and Schapiro's position in the company would be equal as to shareholdings, benefits, terms of employment, etc.; and testified that Schapiro agreed to give him such agreements when the companies merged in 1971.[54] Further, plaintiff testified that in 1972 he had several discussions with Schapiro concerning these agreements and he was not concerned that he did not have an agreement then because, from a financial standpoint, the company was solidifying.[55] Plaintiff testified also that he was receiving the same salary, benefits and terms of employment as Schapiro.

In the spring of 1973, plaintiff retained the services of counsel to prepare a contract of employment which included provisions equalizing his and Schapiro's positions.[56] Peter Hjelm testified that plaintiff presented that agreement to him; that he found it unacceptable for several reasons, including the provisions containing "hold harmless" language and options to renew. Hjelm considered them one-sided.[57]

Plaintiff then discussed his draft of the agreement with Schapiro, and testified that Schapiro stated it was not the same as his since the proposed agreement contained a term of employment not contemporaneous with his.[58]

In September, 1973 plaintiff received a draft of an employment contract which had been drawn up this time by ASC's counsel at Schapiro's request.[59] However, plaintiff would not sign it because it did not comport with his understanding of his role in ASC: it did not contain any provision whereby ASC would assume his personal obligations.[60]

On September 18, 1973 plaintiff received from ASC's counsel another revised equalization agreement. Plaintiff testified he objected again because it made plaintiff a guarantor on certain loans which plaintiff maintained Schapiro had agreed to relieve him of. Plaintiff testified that for the first time his faith in Schapiro diminished greatly.[61]

Thereafter, in May, 1974, plaintiff testified that he received yet another employment contract from Peter Hjelm, which plaintiff admitted appeared to be the same as Schapiro's. However, plaintiff did not sign it, insisting it did not contain the necessary equalization terms. After receipt of this contract, plaintiff testified he attempted to convince Schapiro to live up to the terms of their original understanding, but

---

54.  T.T. 615; 700–01.

55.  T.T. 580–81.

56.  T.T. 610; Ex. 40.

57.  T.T. 1823–25.

58.  T.T. 617.

59.  T.T. 672.

60.  T.T. 672–75.

61.  T.T. 679; 685–87.

never received another agreement thereafter.[62]

Schapiro testified that he had offered plaintiff several employment contracts between the fall of 1972 and the summer of 1974. He further testified that plaintiff did not sign any of these proposals because they did not contain indemnification agreements for plaintiff's liabilities; that he informed plaintiff in 1973 that since plaintiff would not be a guarantor on several ASC notes, those Schapiro undertook to guarantee, any equalization agreement would be one sided and he (Schapiro) would not agree to it.[63]

\* \* \* \* \* \*

■ Plaintiff asserts for his eighth claim for relief that he had an oral employment contract with defendants for five years at $50,000 a year. Plaintiff maintains that in 1972 and 1973 Schapiro promised him that they would both be employed on equivalent terms; that in 1973 Schapiro had an employment contract for five years at $50,000 a year. Plaintiff argues that his employment position was terminated in October, 1974, thereby constituting a breach of this agreement, with the result that defendants are liable to him for the three remaining years of the contract.

Plaintiff concedes that this alleged agreement was oral and never reduced to writing. Nevertheless, he argues that the California statute of frauds rule does not bar such an oral agreement. Defendants claim the contrary. The applicable provision is:

> The following contracts are invalid, unless the same, or some note or memorandum thereof, is in writing and subscribed by the party to be charged or by his agent:
>
> 1. An agreement that by its terms is not to be performed within a year from the making thereof; . . . .

*Cal.Civ.Code* § 1624(1)

We first determine whether there was indeed an oral agreement.

> The memorandum need not itself constitute a contract, and apart from its effect as a memorandum, it need have no legal operation. There must be a valid oral contract, however, of which the memorandum is an accurate statement. . . .

4 *Williston on Contracts* 14–15 (footnotes omitted).

And as one court has stated:

> . . . Whether such [oral] contract was made depends upon the intention of the parties and is to be determined by the surrounding facts and circumstances in the particular case. It is a question to be determined by the trial court. . . .

*Beta Sigma Tau v. Shrine Civic Auditorium*, 159 Cal.App.2d 287, 323 P.2d 496, 499 (Cal.Dist.Ct.App.1958).

On the totality of proof adduced on this additional contention, we remain unconvinced that an oral agreement was entered into by plaintiff and Schapiro. At most, all we can find is that in 1972 and 1973 preliminary negotiations were had with a view toward reaching the agreement plaintiff sought. Viewing the surrounding circumstances and analyzing the subsequent negotiations and dealings of the parties, we are not convinced that there was a meeting of the minds as to the essential terms of the agreement.

First, despite plaintiff's repeated assertions that there was a prior oral agreement equalizing his position with Schapiro's in ASC, when plaintiff was presented with a written draft of such an agreement, he refused to sign it because he would not accept the same responsibilities with which Schapiro was burdened. As we see it, if plaintiff had truly intended to have a fully co-extensive role with Schapiro, he would have signed the document.

Second, in all of the discussions and in all of the documents prepared and presented to the respective parties, it clearly appears that the parties could not finally agree on any terms. In fact, plaintiff presented Schapiro with a draft of an agreement (exhibit 40) which contained terms simply not

**62.** T.T. 700–04.

**63.** T.T. 703; 2219–20; 2221; Ex.JL.

a part of the agreement he testified existed, for exhibit 40 included a provision that if plaintiff's insurance broker's license was revoked, he would still be employed by ASC. From plaintiff's own actions, we can only infer that subjects concerning employment and equalization were left open for further discussion. Also, when plaintiff and Schapiro signed the non-binding letter of intent, it contained only a provision that the parties would be paid a $50,000 salary but stated no other terms of employment. The evidence is insufficient to warrant finding there was a meeting of the minds creating a binding contract. See generally *Gold v. Gibbons*, 178 Cal.App.2d 517, 3 Cal.Rptr. 117, 118 (Dist.Ct.App.1960); *F. Piazza Paving Co. v. Bebek & Brkich*, 141 Cal.App.2d 226, 296 P.2d 368, 370–71 (Cal.Dist.Ct.App. 1956).

In essence the parties entered into extensive preliminary negotiations, but never finalized commitments of one to the other.[64] It has been succinctly and forcefully put:

> ... The views of the parties to an agreement as to what are the requirements of a contract, as to what mutual assent means, or consideration, or what contracts are enforceable without a writing, and what are not, are wholly immaterial.... In regards to ... contracts, *the law, not the parties, fixes the requirements of a legal obligation.*
>
> 1 *Williston on Contracts* 38 (footnotes omitted and emphasis added).

■ In his post-trial brief, plaintiff for the first time argues that defendants are liable under a "wrongful termination" theory even in the absence of an employment contract. However, plaintiff's eighth claim for relief is clearly based on a breach of contract. Because this new claim involves questions which defendants had no notice of before or during trial, and for the same reasons which prompted us to deny defend-

ants' request to belatedly amend their pleadings, reasons we here apply in full, we will not consider this new theory now advanced. See *infra* at 390.

### e. Post-discharge difficulties

■ Plaintiff's perceived difficulties with ASC did not end upon his discharge. He claims that when he was discharged certain out-of-pocket expenses were due him, and various personal property he used in connection with the business was retained by defendants. Plaintiff also claims that ASC assumed an LSM note from City National Bank for $150,000 and as guarantor of that note ASC is liable to him. Finally, plaintiff claims that the Lee and Citron notes were assigned to him, that ASC assumed both notes, and ASC consequently is also liable to him thereon.

The first of plaintiff's troubles was the matter of out-of-pocket expenses. The only evidence plaintiff presented at trial was a list of his expenses for a period he alleges he did not receive reimbursement, the reason for which, plaintiff testified, remains unknown to him.[65]

Roy Hjelm, a witness for defendants, was employed in 1974 in the accounting department of ASC. It was his testimony that many of these expenses were not allowed because they were either unauthorized gifts to clients or unaccompanied by receipts; that when plaintiff was discharged he owed the company money; that after deducting allowable expenses, plaintiff owed the company $675.[66]

\* \* \* \* \* \*

For his ninth claim for relief, plaintiff alleges that these out-of-pocket expenses totaling $6,380.64 are due him.

Neither plaintiff nor defendants make legal or factual argument concerning this

---

64. Even though we bifurcated the liability and damage issues, we note (as plaintiff testified) that shortly after the date plaintiff was "terminated" by ASC he opened a new agency and took with him $200,000 worth of business from ASC. His new enterprise immediately became an on-going success. Accordingly, we express

great doubt that plaintiff would indeed have been damaged by the breach of the alleged employment agreement.

65. T.T. 751–55; Ex. 50.

66. T.T. 2372–85.

claim in their post-trial briefs. No reasons are assigned for these omissions; we are led to believe that this claim might be moot or abandoned.

Even if plaintiff had pressed his claim, from our search of the record we do not find the proof at trial convincing.

The second of plaintiff's difficulties after he left ASC concerns certain personal property he used during his employment. Plaintiff testified that he spoke to counsel for ASC who told him to write a letter listing what articles he left behind. Plaintiff wrote such a letter listing items such as rugs, prints, filing cabinets and office equipment.[67] The attorney thereafter wrote plaintiff stating that if he came to the ASC office, certain articles would be returned but others (e. g., the office equipment) were considered a contribution to the company.[68] On cross-examination plaintiff admitted that he had received the letter, took the items listed by the attorney, and left the others behind.[69]

\* \* \* \* \* \*

Plaintiff, in his fourteenth claim for relief,[70] asks for $10,000 which represents, in his estimate, the value of his personal belongings retained by defendants. As with the claim involving out-of-pocket expenses, neither plaintiff nor defendants make legal or factual argument concerning this claim in their post-trial briefs. And as we found in the earlier claim, plaintiff's burden of proof simply has not been met.

As to the promissory notes

The final concerns of plaintiff were the Lee and Citron promissory notes on which he was personally liable before the merger and creation of ASC, the notes which plaintiff stated were used for LSM, and a City National Bank loan to LSM, issued in 1973, on which plaintiff had given his personal guarantee.

Plaintiff testified that in April or May, 1974 he, Schapiro and Lee met. Plaintiff testified that during this meeting Lee stated that she wanted to be repaid; that Schapiro instructed him to prepare a note, sign it on behalf of LSM, and give it to Lee, all of which plaintiff did.[71]

Thereafter Lee stated to plaintiff that she wanted a promissory note signed by Schapiro. Plaintiff testified that he told Schapiro of Lee's request and asked him if he would issue a promissory note to his in-laws as well. Schapiro signed two promissory notes on behalf of LSM, one to the order of Lee and the other to the Citrons; both were dated May 4, 1974.[72] On August 3, 1974 the Lee note signed by Schapiro was assigned to plaintiff; the Citron note was assigned to plaintiff sometime in December, 1974.[73]

Even though the notes were issued by Schapiro on behalf of LSM, ASC did in fact make several payments on the notes to Lee and the Citrons. Plaintiff argues at great length that since ASC did in fact make payments, this is conclusive that ASC assumed the notes. However, Schapiro testified that at the time the notes were issued, ASC was having legal difficulties and he did not want any law suits brought by Lee or the Citrons that would enlarge ASC's problems to any appreciable extent. Schapiro also testified that he did feel some sense of moral obligation to see that the notes were paid.[74]

ASC continued to make payments on these notes, but stopped doing so once plaintiff's position was terminated, a fact which Schapiro admitted was not a coincidence.[75]

City National Bank of Beverly Hills, California had issued a note to LSM on Febru-

---

**67.** Ex. 51.

**68.** T.T. 743–45; Ex. IS.

**69.** T.T. 1446–48.

**70.** Plaintiff's thirteenth claim for relief is moot. *See* Plaintiff's Post-Trial Brief, p. 89.

**71.** T.T. 786–88; Ex. 59.

**72.** T.T. 788; 806; Exs. 61, 65.

**73.** T.T. 794; 805; Exs. 61, 65.

**74.** T.T. 2316–17.

**75.** T.T. 2318.

ary 28, 1973 for $150,000 which plaintiff and Schapiro both personally guaranteed. After plaintiff was discharged, the bank commenced legal proceedings to collect on the note, for LSM as debtor thereon had never paid it. In 1978 or 1979 plaintiff settled with the bank by paying $60,000 of his own funds.[76]

The 1973 note is clear on its face. It was issued by LSM, but plaintiff asserts it was assumed by ASC, and he as guarantor can recover from ASC the money paid in settlement of the bank's claim. Plaintiff points to the deposition testimony of two City National Bank officers, each having dealt with plaintiff on prior occasions, who testified that it was their understanding that ASC and LSM were to merge, and the loan was to be paid from the proceeds of a private placement of stock.[77] Curtis Palmer, president of the bank at the time the loan was made, further testified that the reason the note was issued in LSM's name was that LSM was licensed to do business in California whereas ASC was not, and that "... I certainly wouldn't make a loan to anyone doing business in California without a license."[78] Plaintiff also points to the deposition testimony of Peter Hjelm who testified that ASC had assumed the note.[79] However, in 1975 it was ASC's position that it had not assumed the note and was not liable once the bank commenced proceedings for payment.[80] No documentary evidence whatever was offered into evidence of an express assumption by ASC for payment of the $150,000 note.

Plaintiff asserts in claims 10, 11 and 12 that ASC and Schapiro are liable to him for loans made by City National Bank, Lee and the Citrons. Claim 10 relates to the 1973 City National Bank loan, guaranteed by plaintiff and Schapiro. Plaintiff insists that ASC assumed the note, and under *Cal. Corp.Code* § 2847 (West) the principal debtor, ASC, is obligated to reimburse him as guarantor.

Claims 11 and 12 involve the notes issued by Schapiro on behalf of LSM to Lee and the Citrons in May, 1974; both were assigned to plaintiff, and he as assignee contends that ASC and Schapiro are liable to him by reason of their liability to the principals.

All three notes are clear on their face. They were issued by LSM and plaintiff admits there is no writing covering the assumed liability by defendants. He argues that the California statute of frauds rule does not bar their responsibility on the notes. Plaintiff relies upon the following exception to the general rule that a contract to answer for the debt of another must be in writing:

A promise to answer for the obligation of another, in any of the following cases, is deemed an original obligation of the promisor, and need not be in writing:

. . . .

(4) When the promise is upon consideration beneficial to the promisor, whether moving from either party to the antecedent obligation, or from another person;

. . . .

*Cal.Civ.Code* § 2794 (West).

■ Therefore a promise made to answer for another's obligation must be made upon consideration beneficial to the promisor. The California Supreme Court has interpreted this statutory provision as follows:

... It is well settled that whenever the *leading and main object of the promisor is not to become surety or guarantor* of another but to subserve some interest of his own, the promise is not within the statute even though performance of the promise may pay the debt or discharge the obligation of another.

*Merritt v. J. A. Stafford Co.*, 68 Cal.2d 619, 68 Cal.Rptr. 447, 452, 440 P.2d 927, 932 (1968) (emphasis added).

---

**76.**  T.T. 775; Ex. 55.

**77.**  Ex. 153, pp. 85–86; Ex. 157, p. 17.

**78.**  Ex. 157, p. 30.

**79.**  Ex. 159, pp. 244–45.

**80.**  Ex. 107, note 8.

Plaintiff argues that Schapiro personally guaranteed payment of each of the three loans. First, we are not convinced that Schapiro made any such personal promise either to Lee or the Citrons prior to 1972. We have already stated hereinabove that the testimony thereon was very confusing, contradictory, and conflicting. Further, there was no proof that when Schapiro signed the Lee and Citron notes in 1974 he made a promise to answer personally therefor. Since we find that Schapiro made no promise "to answer for the obligation of another," he can not be held liable for the Lee and Citron notes.

Second, it is plaintiff's position that Schapiro personally undertook to guarantee the City National Bank obligation. In his post-trial brief plaintiff states "[s]ince Schapiro's company was being merged with Rosenbloom's company, there was obviously consideration to Schapiro for the forebearance of the creditors from the collection of those debts."[81]

Plaintiff's reasoning is at best unclear. First, the City National Bank note in question was issued in 1973 whereas the merger of Schapiro's and plaintiff's companies occurred no later than 1972. Since the note was not then in existence, there could be no forebearance of creditors. If plaintiff is asserting that Schapiro promised to personally answer for the earlier 1972 loan to LSM from City National Bank, all we can find is that it was paid in the same year.

It is true that plaintiff along with Schapiro personally guaranteed the 1973 LSM note to City National Bank. However, this was done in the form of a written guarantee to the bank. It seems that he is asserting that Schapiro made an independent promise to personally answer for LSM's obligation, in addition to the written guarantee; that this promise would make Schapiro

the principal debtor and is subject to *Cal. Civ.Code* § 2847 (West). This argument must fall. First, from the proof adduced at trial we are not convinced that Schapiro made this independent and personal promise. Second, if such a promise was in fact made, we would have to conclude that the "leading and main object of the promisor" was to become a surety or guarantor and that the exception to the statute of frauds would not apply. *See Merritt, supra.*

Plaintiff also asserts liability against ASC on the same theory. To support this contention plaintiff refers to the testimony of Schapiro and P. Hjelm to the effect that it was their understanding that ASC had assumed the notes and that ASC had made several payments on the three notes. Again plaintiff concedes that while there was no written promise, the statute of frauds is no bar. We conclude that this argument must also fail.

For plaintiff to succeed there must be a promise from ASC to answer for LSM's debt. *Cal.Civ.Code* § 2794 (West). We are not convinced there was such a promise. There was some trial evidence to the effect that repayment of the note would come from ASC. However, City National Bank issued the loan to LSM. When the bank commenced legal proceedings, it was plaintiff and Schapiro who as defendants in that action were obligated to repay it—not ASC. It is true that ASC did make several payments to Lee and the Citrons on the May, 1974 notes, but we fail to be convinced that ASC made any express promise to answer for these LSM notes.[82]

The Counterclaim

a. Misrepresentations by plaintiff

The essence of the counterclaim is that plaintiff misrepresented to Schapiro the true financial condition of LSM prior to

---

**81.** Plaintiff's Post-Trial Brief, p. 113.

**82.** In his post-trial brief, plaintiff suggests that when Schapiro signed the LSM notes for Lee and the Citrons he knew full well that LSM would never be able to pay the notes. Allegedly this constitutes fraud under California law, and plaintiff as assignee of the notes can assert it. Nevertheless, plaintiff has simply not con-

vinced us that LSM was unable or would never be able to pay these notes. We also note that shortly before Schapiro signed these notes, plaintiff signed a note to Lee on behalf of LSM. It appears then that plaintiff would be equally culpable with Schapiro if indeed LSM was unable to pay these notes.

the organizational transactions which led to the merger and subsequent thereto, plaintiff having resorted to disclosures on a "piecemeal" basis. Specifically defendants claim that plaintiff misrepresented LSM's "out-of-trust" position and concealed his "improper" conduct relating to premiums due John Hancock Mutual Life Insurance Company. All this we have expanded upon hereinabove under section "a".

No cases, statutes or common law holdings are cited to support the claim.[83] On the proof offered and the law applicable thereto, defendants have failed to make out their claim.

The record clearly demonstrates that Schapiro had intimate knowledge of LSM's financial condition before it merged with SBC. Schapiro admitted that during that entire period he knew LSM had financial difficulties and that it owed insurance carriers substantial amounts of money. Again, by his own admission, Schapiro further testified that he frequently visited the offices of LSM and was always given the documents he requested. Further, in the fall of 1971 Schapiro was informed by an accounting firm he retained that the books of LSM were not certifiable; this at a minimum put him on notice that not all was well with LSM. Finally, Schapiro testified that he made an independent detailed investigation of LSM. In light of all this, and considering the fact that Schapiro is a successful and experienced insurance man quite adept at raising capital for business enterprises, it is inconceivable, as Schapiro now claims, that he did not know of LSM's financial difficulties. To the contrary we conclude that Schapiro had complete and true knowledge of LSM's financial difficulties as well as of any "improper" practices which plaintiff assertedly engaged in.

We know of no theory of misrepresentation where a claim can be maintained when the person alleging the damage has complete and true knowledge of the facts. As Prosser has stated:

In order to be influenced by the representations, the plaintiff must of course have relied upon it, and believed it to be true. If it appears that he knew the facts . . . it cannot be regarded as a substantial cause of his conduct. If, after hearing defendant's words, he makes an investigation of his own . . . he may be found not to have relied on the defendant, since the fact that he was unwilling to accept the statement without verification is evidence that he did not believe it.

W. Prosser, *Law of Torts* 714–15 (4th ed. 1971). *See SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968) (en banc), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969) (device would cause "reasonable investors" to rely thereon); *Hafner v. Forest Laboratories, Inc.*, 345 F.2d 167 (2d Cir. 1965) (information equally available to both plaintiff and defendant precluded plaintiff's claim). *See generally* Bromberg & Lowenfels, 3 Securities Fraud & Commodities Fraud pp. 204.244–204.255 (1979).

The total proof with which the counterclaim deals leaves us unconvinced that it has been established.

b. Proposed counterclaim

■ Defendants now for the first time (in their post-trial brief) ask us to deem their pleadings amended to assert a second counterclaim for plaintiff's breach of a non-competition agreement with ASC.[84] Defendants allege that plaintiff signed two such agreements, and upon the termination of his employment, plaintiff took $200,000 worth of business from ASC to his new company, all in violation of that agreement.

We need not decide the merits of defendants' belated claim. We deny their request to amend. Our Circuit Court has stated in the context of post-trial motions to amend:

Although leave to amend pleadings should be freely given when justice requires, the trial judge's discretion is broad and its sound exercise usually depends on such factors as 'undue delay,

---

**83.** Defendants' Post-Trial Brief, pp. 138–43.

**84.** Defendants' Post-Trial Brief, p. 7.

bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.'
.... The purpose of Rule 15(b) is to allow the pleadings to conform to issues actually tried, not to extend the pleadings to introduce issues inferentially suggested by incidental evidence in the record. [citations omitted].

*Browning Debenture Holders' Comm. v. DASA Corp.*, 560 F.2d 1078, 1086 (2d Cir. 1977).

Given the enormous amount of discovery since the inception of this case, defendants have had ample opportunity to raise this claim. This action was commenced approximately seven years ago, and defendants had repeated occasions to interpose it. As plaintiff rightfully points out, defendants must have known in 1974 or 1975 that plaintiff took business away from ASC (plaintiff was operating a new agency in the same vicinity). It goes without saying that before and throughout the entire trial, plaintiff was unaware (and therefore unprepared to meet) what is now proposed by defendants for the first time. In fact the essence of the proposed counterclaim was touched upon (barely so) in the course of the trial. Defendants missed that opportunity to develop and expand upon it.

Certainly, we are constrained to, and do, deny the extremely belated application to assert a second counterclaim. *See, e. g., Eriksson v. Galvin*, 484 F.Supp. 1108 (S.D.N.Y.1980); *Crane Co. v. American Standard, Inc.*, 88 F.R.D. 199 (S.D.N.Y.1980).

### Conclusion

Throughout the trial we were struck by the strong antipathy reflected by Rosenbloom and Schapiro towards one another. At times the very atmosphere was surcharged by their bitterness. This distressing and disturbing factor increased our burden tremendously, for frequently we were compelled to attempt to scrape away from

portions of their testimony the deep layer of ill-will wrapped around it. Such efforts on our part proved extremely difficult and often fruitless.

The total oral testimony adduced in support of the entire complaint was saturated with uncertainty, insufficiency, conflicting in major respects and unconvincing as to each of the vital aspects of the claims alleged. Without such oral evidence, the documentary and other proof received into evidence is insufficient to make out the claims. In essence the oral testimony is the mortar that binds the bricks of documentary proof together. We declare and conclude the mortar severely insufficient and totally without the positive strength essential to adequately fulfill its function.

As to the total oral testimony adduced in support of the counterclaim and other asserted defenses our final estimate is the same and so we reiterate at this point, in full and with equal force, our conclusion with respect thereto as immediately above announced with respect to plaintiff's total oral testimony, to wit, uncertain, insufficient, conflicting and unconvincing. See *Texas Distributors v. Local Union No. 100*, 598 F.2d 393, 402 (5th Cir. 1979); *N.L.R.B. v. Patrick Plaza Dodge, Inc.*, 522 F.2d 804, 809 (4th Cir. 1975); *Diesel Tanker F. A. Verdon, Inc. v. Stakeboat No. 2*, 340 F.2d 465, 467 (2d Cir. 1965); *Hartford Ins. Co. v. County of Nassau*, 46 N.Y.2d 1028, 389 N.E.2d 1061, 416 N.Y.S.2d 539 (1979); *Cal. Civ.Code* §§ 115, 500, 502 (West).

We are compelled to note that our total reaction to the testimony of the principal litigants was bolstered by our conclusion that on occasion they took liberty with the truth.[85] Even in the absence of those instances, our ultimate conclusion would be the same, for the total oral proof adduced in the trial record was insufficient to support the plaintiff's claims and defendants' counterclaim.

With characteristic candor matching the earnestness of his efforts at trial, plaintiff's counsel asserts in his post-trial brief (p. 4):

---

**85.** *E. g.,* T.T. 221–22, 2271; 2324–26.

"It is submitted that, while Mr. Rosenbloom may not have been the most articulate possible witness and may not have been the best schooled in the techniques of testifying, his overall testimony was truthful and worthy of being credited."

On the total trial record and the law applicable thereto, we find that plaintiff has failed to prove and establish each and every claim set forth in his complaint (as amended) by a fair preponderance of the credible proof.

On the total trial record and the law applicable thereto, we find that defendants have failed to prove and establish the counterclaim by a fair preponderance of the credible proof.

We were strongly inclined to pronounce this disposition at the close of the last trial day, but decided the better part of wisdom would dictate that we reserve decision pending our study of post-trial proceedings including briefs. That having been done, we remain adamant; nothing warrants differing in the least with our earlier resolve; we have not been persuaded otherwise.

As a matter of law, neither plaintiff nor defendants have met the burden of proof which the law makes imperative.

Accordingly, we grant each motion to dismiss and direct the dismissal of the complaint and the counterclaim in all respects. Court costs are denied each litigant.

The foregoing constitutes our findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

SO ORDERED.