[Civ. No. 16608.   First Dist., Div. One.   May 2, 1956.]

LEO F. PIAZZA PAVING COMPANY (a Corporation), Appellant, v. BEBEK AND BRKICH (a Partnership) et al., Respondents.

Bressani & Hansen for Appellant.

Miller, Morton & Wright, Charles V. Caillat and Richard W. Morton for Respondents.

PETERS, P. J.—This appeal involves the question as to whether the evidence shows, as a matter of law, that a contract existed between the plaintiff Leo F. Piazza Paving Company, a corporation, and the defendants Bebek and Brkich, operators of a partnership. The trial court found that no contract existed. Plaintiff appeals.

The plaintiff is a general contractor engaged in road construction. The defendants are pipe laying contractors. The state called for bids for the construction of Stevens Creek Road in Santa Clara County, bids to be submitted by September 10, 1952. Plaintiff desired to bid on that project. Before submitting its bid, plaintiff approached several subcontractors, including defendants, to secure bids from them on certain items of the work that plaintiff intended to subcontract. Among other items, the plaintiff intended to subcontract items 1, 4, 5, 21-32 of the general contract relating to the excavation and implacement of reinforced concrete pipes and storm drains.

The first meeting between plaintiff and defendants at which this problem was discussed occurred late in August, 1952, when Leo Piazza, president of plaintiff, and Bebek, Brkich, and Kappetanich, bookkeeper of defendants, met in defendants' office. According to Bebek, at that meeting Piazza simply mentioned the Stevens Creek Road job and told defendants that when he received the plans and specifications he would take them over to look at the job. Bebek also testified, via deposition, that about a week later, Piazza again called at defendants' office and brought the specifications with him; that he, Bebek and Piazza went out and looked over the job and also visited the Piazza rock plant; that they returned to defendants' office and discussed the job in the presence of Kappetanich. Then one of the crucial conversations took place. Bebek testified that Piazza said he "wanted a quotation on a storm drain"; that Bebek replied: "According to the plans I don't like the plans. They say that I can't give you exact quotations. These plans are not clear to me, because

jetting* is not allowed. They didn't say that jetting will go down below or not." Piazza stated that they could jet, to which Bebek replied: "I am not sure, because I had been working state jobs before, and we always substitute selected material, either sand or tamping." Bebek added: "That is why I couldn't give him the exact quotation." Piazza replied: "I think the job can be jetted, and use the same material back in the ditch, again . . . except the last foot, which the specification calls for should be rock." Bebek replied: "I won't take a chance on it, but if you want to bid that way it is O.K." Bebek added: ". . . The state believes in tamping the ground. That is why I wasn't sure to give him a firm bid on the job." Piazza nevertheless asked for a bid, to which Bebek replied: "I can't give no bid, because I don't trust those 'specs,' but if you want to take a chance to use the same material, dig the ditch, use the same material back, and jet it up to last two feet, quotation can be used about $1.25 a yard for the dirt, using the same dirt back . . . sand or selected material would be $2.00 a yard." Bebek stated that he had to go to Los Angeles, but "I will give you some kind of an idea to use to bid on a job. . . . I told him that I give him a bid, but it is O.K. if he wants to use this quotation and it is O.K. if he don't want to use it."

The specifications provide that: "No jetting will be allowed within two feet of the surface of the trench and on that portion of the trench across State Route 114, the entire back fill shall be compacted with pneumatic tampers as well as the final two feet of the trench." Bebek also testified: "Yes, he asked me for a bid. I told him, 'I can't give you no bid, because the "specs" are not clear to me.' "

It is a fair interpretation of this evidence that Bebek did not intend a firm offer by this conversation, although he did know that Piazza was going to submit a bid to the state for this job.

Kappetanich substantially corroborated this testimony. He was quite clear that Piazza had stated that in Santa Clara County jetting could be done, but that Bebek replied: "Well, in that case, we probably can give you a figure, but I'm not sure because we can't give you a bid unless we are sure what

---

*"Jetting" is a process of back filling by replacing an excavation with the same material removed from it and soaking the back fill with water, and allowing it to settle. In some cases "tamping" is required. Tamping is to back fill with the same material and then press or tamp it. Tamping is more expensive than jetting. A third method of back filling, and the most expensive, is to use imported material for this purpose.

is going on.'' Piazza nevertheless insisted on a bid, to which Bebek replied that he ''wasn't sure about the specifications and that is why he couldn't give him the bid.'' In response to Piazza's insistent request for a bid Bebek stated: ''I'll give you a figure so you can use it, that is all,'' making it clear that such figure would be for jetting.

Thereafter Bebek and Kappetanich prepared detailed quotations for the job and, on September 8th, Piazza again came to defendants' office ''and copied quotations that we had prepared,'' getting the figures from Kappetanich's work sheet which bore on its face the statement: ''Flooding with the same excavated material.'' Kappetanich testified that after Piazza had copied the figures, ''We told him that we could not give him a bid because it was in question about the jetting of the material, and I told him that we can give him a figure, . . . so he could bid the job.'' Kappetanich several times clearly stated that the figure was based on jetting up to two feet of the surface, without select material. Piazza replied: ''Well, that is all right. You can do that because it is in Santa Clara County.'' Kappetanich was positive that at no time was a promise made to do the work at the quoted figure, and that at no time was there delivered to Piazza any written promise to do the job at any figure. Defendants did prepare and deliver to plaintiff a written memorandum setting forth, in some detail, what defendants call their ''quotations.'' This memorandum contains a complete itemization of all items of the contract here involved.

Thereafter, plaintiff submitted its bid to the state, and it was accepted. Admittedly, plaintiff, in computing its bid, used the figures, as to the items here involved, which it had got from defendants. The figures submitted by defendants were the lowest submitted for the pipe work. Plaintiff notified defendants, first orally and then by letter, that they were the low bidders on the jobs here involved. Defendants refused to perform the contract. Plaintiff resubmitted it to other subcontractors, who agreed to tamp the back fill, and this resulted in a bid totalling $5,586.50 more than the figures suggested by defendants.

This evidence, in many respects, was contradicted by Piazza. He testified that Bebek never told him that the submitted figures were anything but a formal bid, and contended that there was no dispute over the specifications, but admitted that he knew that the state never permitted jetting on its road contracts. Piazza denied making a copy of the figures

in defendants' offices, claiming those had been sent to him as an offer to contract.

Plaintiff thereupon filed this suit for breach of contract. Defendants denied that they had offered to enter into a contract, denied that they had breached the contract, and denied the allegations of damage.

The trial court, on this evidence, found that defendants had not made an offer to contract with plaintiff, and that the parties had never entered into a contract for the performance of the work here involved. In reference to the figures submitted by defendants to plaintiff the court specifically found: "That it is true that on or about the 8th day of September, 1952, the defendants gave to the plaintiff a written memorandum containing a certain set of figures referring to the work specified in Paragraph III of these Findings of Fact, that it is true that the said set of figures was not intended by the defendant[s] to be an offer to perform said work and was not received by the plaintiff with the intention that it was an offer to perform said work."

On this appeal both sides agree that for a valid contract to exist the consent of the parties must be free, mutual, and communicated by each to the other, and that consent is not mutual unless all the parties agree upon the same thing in the same sense. (Civ. Code, §§ 1565, 1580.) Both sides also agree that in determining whether there has been a mutual consent to contract the courts are not interested in the subjective intent of the parties, but only in their objective intent—that is. what would a reasonable man believe from the outward manifestations of consent. (*Brant* v. *California Dairies, Inc.,* 4 Cal.2d 128 [48 P.2d 13] ; *Canavan* v. *College of Osteopathic Phys. & S.,* 73 Cal.App.2d 511 [166 P.2d 878].)

▇ This general rule, approved in California, is expressed in section 25 of the Restatement of Contracts as follows:

"If from a promise, or manifestation of intention, or from the circumstances existing at the time, the person to whom the promise or manifestation is addressed knows or has reason to know that the person making it does not intend it as an expression of his fixed purpose until he has given a further expression of assent, he has not made an offer."

Comment "a" to this section reads:

"It is often difficult to draw an exact line between offers and negotiations preliminary thereto. It is common for one who wishes to make a bargain to try to induce the other

party to the intended transaction to make the definite offer, he himself suggesting with more or less definiteness the nature of the contract he is willing to enter into. Besides any direct language indicating an intent to defer the formation of a contract, the definiteness or indefiniteness of the words used in opening the negotiation must be considered, as well as the usages of business, and indeed all accompanying circumstances." (See generally *Sackett* v. *Starr*, 95 Cal.App.2d 128 [212 P.2d 535].)

Thus, the basic question involved is whether, measured by the objective standard, there is any substantial evidence to support the finding that defendants did not make an offer, or intend to make an offer, to perform the work.

Plaintiff argues that while there was some uncertainty as to the intent of the parties up until the last meeting between Piazza and Bebek, such uncertainty was completely removed when Kappetanich, several days later, knowing that Piazza intended to use them in his bid, handed Piazza plaintiff's Exhibit One containing price quotations on the items requested. It is argued that, tested by the objective standard, this led plaintiff as a reasonable man to believe that defendants were making an offer to contract. Plaintiff also places some reliance on two letters written by defendants in October and November, 1952, telling plaintiff that they could not perform the work due to "pressing difficulties" and "circumstances beyond our control," contending that since such letters did not deny the existence of the contract they amounted to a recognition of its existence.

If these were all of the facts there might be some merit in plaintiff's position. But these are not all of the facts. All of the surrounding circumstances must be considered. When Bebek told Piazza that he would furnish Piazza figures for the bid, he stated: "I can't give no bid, because I don't trust those 'specs,' but if you want to take a chance [of jetting] . . . quotation can be used about $1.25 a yard for the dirt, using the same dirt back . . . sand or selected material would be $2.00 a yard." Bebek made it quite clear that he was not giving a figure at which he would do the job, but merely giving to Piazza "some kind of an idea to use" in making his bid, and he was specific that "but it is O.K. if he wants to use this quotation and it is O.K. if he don't want to use it." This was corroborated by Kappetanich, who also testified that when Piazza later called at defendants' office and copied the work sheet containing a quotation of

prices, he, Kappetanich, told Piazza that they could not give him a bid because the jetting was in question, but they would give him a figure so plaintiff could bid on the job. This occurred the very same day the quotation of prices was handed to plaintiff. This quotation of prices contains no promises, and it specifies no place or time of performance. Reasonably interpreted it is what its name implies, a mere quotation of prices given to plaintiff by defendants in fulfillment of Bebek's promise to give Piazza a quotation of prices to aid him in preparing his bid for the state.

Under these circumstances, it is apparent that the trial court was justified in concluding that Bebek actually communicated to Piazza that his intent was not to make an offer, but was to submit a mere quotation of prices. The finding of the trial court to this effect is amply supported.

Nor is there any material significance in the October and November letters relied upon by plaintiff as a recognition of the existence of a contract. Although they do not specifically deny the existence of a contract, it must be remembered that in fact no contract then existed. In these letters defendants declined to do the work, which is compatible with a construction of the letters as a rejection by defendants of plaintiff's offer to contract at the prices quoted by defendants. There is nothing in these letters acknowledging the existence of a contract. In fact, defendants' refusal to do the work can be interpreted as an assertion that there was no binding contract.

Plaintiff next urges that the lack of an intent to contract is new matter constituting an affirmative defense which must be pleaded. The point is without merit. ▪ Mutual consent is one of the essential elements of a contract, and must, therefore, be pleaded and proved by the plaintiff. ▪ Here plaintiff pleaded an oral offer to do the work at the quoted prices. Defendants denied this allegation. Thus, whether an offer had been made was the vital issue presented. Certainly whether an offer was in fact made in no sense was an affirmative defense.

The judgment appealed from is affirmed.

Bray, J., and Wood (Fred B.), J., concurred.