The **FOLEY COMPANY**

v.

**WARREN ENGINEERING, INC.**

Civ. No. 1:91–cv–542–WCO.

United States District Court,
N.D. Georgia,
Atlanta Division.

Oct. 6, 1992.

Seth R. Price, Shapiro Fussell Wedge & Smotherman, Atlanta, Ga., for Foley Co.

James Joseph Brissette, Hurt Richardson Garner Todd & Cadenhead, Atlanta, Ga., for Warren Engineering.

## ORDER

O'KELLEY, Chief Judge.

The captioned non-jury case was tried before the court on September 2 and 3, 1992, on plaintiff The Foley Company's ("Foley") promissory estoppel action against defendant Warren Engineering, Inc. ("Warren"). After carefully considering the testimony, the documentary evidence, and the arguments of counsel, the court makes the following findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a).

## FINDINGS OF FACT

This lawsuit arises out of an invitation for bids by the United States Army Corps of Engineers ("the Corps") for the construction of a project known as the Alter Steam Plant, Area A, Arnold Engineering Development Center, located in eastern Tennessee. The project involved the removal and replacement of boilers. Foley, the plaintiff, is a mechanical contractor based in Kansas City, Missouri. Foley performs as a general contractor for mechanical work including piping and plumbing; the company performs work in industrial and commercial projects, including government contracts. Warren, the defendant, is a manufacturer of mechanical equipment and also operates as a representative for other manufacturers of mechanical equipment.[1]

At issue in this case is the pricing for forced draft ("FD") and induced draft ("ID") fans[2] given by Warren to Foley in August of 1989, which pricing Foley incorporated into its bid for the Corps' Alter Steam Plant project. Foley claims that Warren gave it a firm quote for the fans upon which it reasonably relied in making its bid to the Corps, and that Warren is liable under promissory estoppel for its subsequent refusal to provide the fans at the quoted price. Warren contends that it is not liable because its pricing to Foley was not a firm quote or a promise to provide the fans at the stated price, and because Foley did not rely and could not reasonably have relied upon Warren's quote as a firm offer.

The Corps solicited bids for the Alter Steam Plant for the first time in March of 1989. At that time, Warren requested a copy of the plans and specifications provided by the Corps for the project so that it could offer a bid on the boiler exhaust system. Warren did offer a system price to another contractor, Blount Brothers; the estimated cost of the forced draft and induced draft fans was $110,000. Based upon the response to the solicitation, the Corps elected not to proceed with the project at that time, and therefore no award was made.

1. According to Raymond Warren, the president and sole shareholder of Warren, there formerly were two companies: Warren Environment, which sold total systems of equipment, and Warren Engineering, which pursued sales of air pollution control equipment for other manufac-turers. The two companies merged for tax reasons almost two years ago.

2. Forced draft fans take air into the boiler for combustion; induced draft fans take air out of the boiler through the stack.

In July of 1989, the Corps issued its second solicitation of bids for the Alter Steam Plant project; interested bidders were to submit their bids by 2:00 p.m. on August 31, 1989 (the "bid date"). Foley received a presolicitation notice on July 3, 1989, and ordered a set of plans and specifications governing the project. Warren learned of the solicitation from Langley Systems, one of its manufacturer's representatives, but did not order the plans and specifications; as a result, Warren's name did not appear on the planholders list, which lists persons and entities who have received the plans from the Corps. Warren did, however, request a copy of the planholderslist, presumably in order to know which general contractors were potentially bidding the project.

Sometime prior to the bid date, Foley received an amendment to the specifications for the FD and ID fans, which became effective on August 21, 1989. Among other changes, the amendment called for double-width fans and concrete foundation pads and also specified, "Fans, turbines, motors, gears and couplings shall be supplied by the fan manufacturer." Def. Exhibit 12 at ¶ 12.1.10. Because it was not on the planholders list, Warren did not receive a copy of this amendment; however, it was admitted at trial that Warren could have obtained access to the plans and specifications to see if there had been any changes since the first solicitation in March of 1989.

As of August 28 or 29, 1989, Foley had a "plug number," or an internal estimate, for the FD and ID fans of $125,000. Had it received no other bids or quotes, Foley probably would have used its plug number in arriving at its final bid to the Corps. Foley also had a "budget price" from Kansas City Equipment Company of $112,000. A budget price is a quote given by a supplier for the convenience of the general contractor in assembling its bid; it is not a firm quote, and the general contractor understands that the supplier is not necessarily going to supply the equipment at the named price.

On August 28, 1989, Glenn Farrow, an estimator for Foley, contacted Thad Warren, the president's son and a sales engineer for Warren, by telephone. Telephone records indicate that the call lasted 8.4 minutes, but neither Farrow nor Thad Warren could recall what was discussed in the conversation. Farrow testified that he was interested in getting quotes on anything that Warren was bidding, that he had no authority to bind Foley to a particular subcontractor, and that he did not tell Thad Warren that Foley would purchase anything from Warren. Although the details of the conversation are shrouded in mystery, Farrow wrote down Warren's pricing for various components on Foley's standard form telephone quote sheet. Plaintiff's Exhibit 6. On that sheet, prices are listed by various pieces of equipment, including duct expansion joints, dampers, economizers, and FD and ID fans.[3] The pricing for the FD and ID fans was as follows:

FD fans w/dampers & drives on boiler 3 & 4—$30,000
ID fans       "              "           "        —$80,000

Very few other details are provided on this form: most of it is left blank, including a line labeled "is quote per plans and specs" and a space at the bottom of the page for exceptions. Farrow testified that the absence of notations in the exceptions space indicates that in fact there were no exceptions, and that if the pricing had not been per plans and specifications, that fact

3. Certain of the items quoted, such as economizers and expansion joints, were not in alternate # 3, which Foley was bidding. Alternate # 3 did include the FD and ID fans.

would have been noted in the exceptions space.[4] Thad Warren contends that he gave pricing for an entire system, of which the FD and ID fans were components, but he does not recall telling Farrow (or Farrow having asked) whether he was giving systems pricing; he recalls only that he gave verbal pricing over the telephone and has no notes or recollection of what he told Farrow.

After this conversation, Farrow took the phone quote sheet to James Cox, Foley's purchasing agent, whose job it was to collect the prices on equipment before bid date and select the prices to be used in the final bid. In the case of the FD and ID fans, Cox had before him the budget price of $112,000 from Kansas City Equipment and a price of $110,000 from Warren. No other quotes were received on the fans prior to August 31, and Cox asserted that he had no reason to doubt that Warren's quote was reasonable; accordingly, he entered the price of $110,000 on his spread sheet, and that price was thus incorporated into Foley's total bid for the project. It appears to be conceded that Foley did not tell Warren prior to bid date that it intended to use Warren's bid for the fans; it was also agreed that it is common in the business for the general contractor not to tell the subcontractor prior to bid date that its bid will be incorporated into the final bid for the project.

At 11:25 a.m. on August 31, two and one-half hours prior to bid time, Thad Warren faxed a message to Langley that he "mistakenly gave pricing for 1 FD fan not two. ID fan pricing is correct." Plaintiff's Exhibit 7. This error resulted in Warren's price for the fans being $140,000 instead of the $110,000 figure given to Foley; however, no one at Warren contacted Foley to inform it of the error.

At 2:00 p.m. on August 31, Foley submitted its bid to the Corps, which incorporated Warren's $110,000 price for the FD and ID

fans. One of the terms of the bid, as required in government contracts, was that Foley's offer for the project was firm for 60 days or Foley would have to pay 20 percent of the bid price. Foley was identified as the lowest apparent bidder for the project and was awarded the prime contract on September 27, 1989. On September 14, after the bid date but before Foley was awarded the contract, Foley received from Buffalo Forge Company a written quote of approximately $361,000 for the FD and ID fans. Def. Exhibit 29.

On September 29, Bud Hancock of Foley contacted Thad Warren by telephone and requested written confirmation of Warren's oral pricing. As a matter of company policy, Foley always obtains written confirmation of all oral quotes it receives during the bid process. On October 11, 1989, Thad Warren sent a written "proposal" for the project, giving pricing on ducts, expansion joints, economizers, dampers, and fans. The fans were priced at $140,000, $30,000 higher than their oral quote to Foley. Joint Exhibit 10. A handwritten memo from Bud Hancock dated October 24 indicates that he had not yet received Warren's confirmation. Def. Exhibit 10 at 1. That memo further describes Buffalo Forge's quote as "high but complete," states that Kansas City Equipment "quoted also," and states, "We used Warren Engineering number." *Id.* at 3.

On December 1, Bill Hooker called Thad Warren to advise him of Foley's intent to award the purchase order to Warren at $110,000, and he inquired about the $30,000 discrepancy in the first and second quotes. A series of telephone conversations, now with Ray Warren, led to Foley sending Warren a copy of the amended plans and specifications. Warren informed Foley that in light of the amendments both prices were incorrect, and gave a new price of approximately $250,000. After this point, Foley continued to correspond with War-

---

4. Besides assuming from the absence of exceptions that Warren's pricing was per plans and specifications, Farrow also assumed that Warren was a qualified bidder for the project because Warren offered Foley a price for the fans. Farrow further assumed that Warren was will-

ing to sell the FD and ID fans only, and was not pricing an entire system. Although Farrow did not recall discussing the August 21 amendments with Thad Warren, he assumed that the pricing given him by Warren complied with those amendments.

ren, but also actively solicited pricing from numerous other suppliers for the fans. When the Corps revised its specifications again in late December, Foley sent out another round of letters to suppliers, requesting revised pricing in light of the latest changes. On January 17, 1990, Warren wrote Foley "declin[ing] to bid" on the project because it was not a fan manufacturer as required under the August 21 amendments. Joint Exhibit 15. Foley responded to Warren's letter on February 2, informing Warren that Foley had relied and continued to rely on Warren's $110,000 price. Joint Exhibit 16. Warren responded that "it is indeed unfortunate the Foley Company has been placed in a position of having to supply equipment which is at a cost to you exceeding the price which was apparently in your estimate. Such are the general contractor's risks in the way bids are taken and jobs quoted of this nature." Joint Exhibit 17.

Foley ultimately issued a purchase order for the fans to Chicago Blower on February 27, 1990; this purchase order offered much more detail than the telephone quote sheet used for Warren, and indicated a price of $221,513 for the FD and ID fans. Joint Exhibit 18. Foley does not consider itself bound to purchase from a particular supplier until a purchase order has been issued.[5] No purchase order was issued by Foley to Warren in this case.

## CONCLUSIONS OF LAW

■ The theory upon which Foley seeks to recover damages is not breach of contract, but promissory estoppel:

A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee ... and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

O.C.G.A. § 13–3–44(a); Restatement 2d of Contracts § 90; see also Insilco Corp. v. First Nat'l Bank of Dalton, 248 Ga. 322, 283 S.E.2d 262 (1981). Thus, in order to prevail, the plaintiff has the burden of proving, by a preponderance of the evidence, that: (1) the defendant made certain promises; (2) the defendant should have expected the plaintiff to rely upon those promises; (3) the plaintiff did in fact rely upon those promises to its detriment; and (4) injustice can be avoided only by enforcement of the promise. Doll v. Grand Union Co., 925 F.2d 1363, 1371 (11th Cir. 1991). "[P]romissory estoppel claims are extremely fact-specific and are not susceptible to the application of generalized rules." Id. at 1372.

■ The threshold requirement of a promissory estoppel claim is, of course, that there be some enforceable promise by the defendant.[6] A "promise" may be de-

---

**5.** Further evidence of this intent not to be bound to a particular supplier until a purchase order has been issued was introduced by the deposition testimony of Bud Hancock of Foley, who contacts suppliers after Foley has been awarded a contract but not during the bid procurement process. Hancock Deposition at 16.

Q: Would you expect that written proposal [confirming an oral quote] to come to you or would it go to somebody else?
A: It could come to me or it could come to the Construction Manager, either one.
...
Q: But your role basically is simply to receive it and pass it on?
A: Pass it on to the one that's going to make the decision.
Q: Pass it on to the one that's going to make the decision as to what?
A: As to whether they're going to use it, whether it's correct. The Construction Manager controls the dollar value of the job and

it's up to him to determine who he's going to use.
Q: ... Do you go back and try to get written confirmation from all the people that have put in bids?
A: If they're telephone.
Q: Right. But you do that for all of them?
A: Yes.
Q: Why do you do that for all of them?
A: Just the policy that we do.
Q: And then once you get all those written bids, then you select the ones that you want to use?
A: We give it to the Construction Manager and he takes it from there.
Q: And he determines who to use; is that right?
A: Right.
Hancock Deposition at 36–38.

**6.** "[C]ertain promises may be so vague and uncertain that reliance on them would not be reasonable." Doll, 925 F.2d at 1372 (citing

fined as a manifestation of an intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made. Restatement 2d of Contracts § 2. The key question thus becomes whether Warren made an unconditional promise to provide the FD and ID fans to Foley at the stated price of $110,000. *See Protective Life Ins. Co. v. Robinson*, 193 Ga.App. 316, 318, 387 S.E.2d 603 (1989). If there is no promise to be enforced, then promissory estoppel will not apply. *Loy's Office Supplies, Inc. v. Steelcase, Inc.*, 174 Ga.App. 701, 702, 331 S.E.2d 75 (1985). Again, it is the plaintiff's burden to prove that a promise was made. *Doll*, 925 F.2d at 1371.

Here, a promise was made, if at all, during the telephone conversation with Thad Warren initiated by Glenn Farrow on August 28, 1989. The plaintiff's case rises or falls with that conversation. Both individuals were questioned about the August 28 conversation at trial; neither could recall what was said, and neither had any notes memorializing the conversation. The only hint of what transpired during those 8.4 minutes comes from Plaintiff's Exhibit 6, Foley's standard form telephone quote sheet which was filled out by Farrow—and even it is less than clear. The quote sheet contains very few details other than prices for various kinds of equipment, including FD and ID fans and some equipment that Foley did not intend to purchase from Warren. It does not specify delivery dates or bond rates; it does not state whether Warren's quote is per plans and specifications;

it does not state whether there are any exclusions or exceptions to Warren's quote; and it does not indicate in any way what those numbers were intended to represent—a budget price, an indication of how Warren had bid the project in the first solicitation, or a "firm offer" for the second solicitation which would give rise to an enforceable promise. Given the allocation of the burden of proof and the fog that persistently envelops this critical telephone conversation, the court finds that Foley has not met its burden of proving that an enforceable promise was made by Warren on August 28.

There are no Georgia cases on all fours with the factual setting in this case. As a result, the parties have relied upon cases from other jurisdictions. Foley relies heavily upon *Drennan v. Star Paving Co.*, 51 Cal.2d 409, 333 P.2d 757 (1958), the leading case in subcontractor's bids and promissory estoppel.[7] In *Drennan*, the California Supreme Court held that a subcontractor who makes a bid to a general contractor binds itself to perform according to its promise because the general contractor has relied on that promise in making its own bid.[8] Foley asserts that the facts of that case are almost identical to the captioned case and thus require that Foley prevail. The court disagrees.

■ The first substantial difference between *Drennan* and the captioned case is that in *Drennan*, "[t]he trial court found on substantial evidence that defendant made a definite offer to do the paving ... according to the plans and specifica-

---

*American Viking Contractors v. Scribner Equip. Co.*, 745 F.2d 1365, 1372 (11th Cir.1984)).

7. *Drennan* has been cited and relied upon in *Montgomery Indus. Int'l, Inc. v. Thomas Constr. Co.*, 620 F.2d 91, 95 (5th Cir.1980) (construing Texas law).

8. When plaintiff used defendant's offer in computing his own bid, he bound himself to perform in reliance on defendant's terms. Though defendant did not bargain for this use of its bid neither did defendant make it idly, indifferent to whether it would be used or not. On the contrary it is reasonable to suppose that defendant submitted its bid to obtain the subcontract.... It was to its own interest that the contractor be awarded the general contract; the lower the subcontract bid, the lower the general contractor's bid was likely to be and the greater its chance of acceptance and hence the greater the defendant's chance of getting the paving subcontract. Defendant had reason not only to expect plaintiff to rely on its bid but to want him to.... Given this interest and the fact that plaintiff is bound by his own bid, it is only fair that plaintiff should have at least an opportunity to accept defendant's bid after the general contract has been awarded to him. *Drennan*, 333 P.2d at 760.

tions...." *Drennan*, 333 P.2d at 758.[9] In this case, as explained above, there was not "substantial evidence" to show that Warren made a definite offer to supply the fans according to the plans and specifications then in effect. There is evidence that Foley ultimately may have considered Warren's quote to be a bid and relied upon it as such. However, reliance alone does not a promise make; there must be something approaching a meeting of the minds, or a mutual understanding that a promise is being made upon which the promisee may reasonably be expected to rely. There is no substantial evidence to support the conclusion that Warren intended on August 28 to make a firm offer or bid upon which it could reasonably expect Foley to rely. Such a finding may result in the defendant being rewarded and the plaintiff punished for sketchy recordkeeping or faulty memory, but the court cannot assist the plaintiff in carrying its burden of persuasion by "filling in the blanks" to infer a firm offer where there is no evidence either to support or to refute that inference.

■ Second, the defendant in *Drennan* affirmatively contacted the general contractor and "stated that he was bidding for defendant for the paving work at the Monte Vista School according to plans and specifications...." *id.*, whereas there is no evidence here that Warren made any such affirmative efforts or statements. Foley argued at trial that the question of who contacted whom for the quote should be irrelevant. However, the court sees a distinction between a supplier affirmatively calling a general contractor to make a firm offer for a project according to plans and specifications and a general contractor calling a supplier "out of the blue" to solicit a quote for a project for which it knew or should have known that the supplier did not have the current plans and specifications. The first scenario logically invokes some obligation on the part of the supplier, who has sought out a contractor in the hope of getting some business, to abide by a firm offer once made. The second scenario, under the facts of this case, does not impose a similar burden, particularly in light of the fact that there is no evidence to indicate that the plans and specifications (or the amendments thereto) were discussed, or that the price quoted was even a firm offer.

Third, the general contractor in *Drennan* was never given an opportunity to accept the subcontractor's bid; he attempted to accept the subcontractor's bid one day after being awarded the prime contract, but the subcontractor preempted his acceptance by immediately revoking its bid on grounds of mistake. The court in *Drennan* specifically stated, "It bears noting that a general contractor is not free to delay acceptance after he has been awarded the general contract in the hope of getting a better price." *Drennan*, 333 P.2d at 760. It is clear from the evidence in this case that Foley never informed Warren that its bid had been accepted; the closest form of acceptance came on December 1, three months after bid date, when Bill Hooker advised Thad Warren that Foley intended to award Warren the contract at the $110,000 price but needed to resolve the $30,000 discrepancy.[10] As a matter of company policy, Foley always requests written confirmation of all oral quotes it receives, and not merely the oral quotes it relied upon in making its bid. Foley contends that this is merely a form of due diligence; however, the written confirmations are sent to the Construction Manager for him to determine "who he's going to use." Hancock Deposition at 37. It thus appears that Foley has a policy of "delay[ing] ac-

---

**9.** The *Drennan* court distinguished a case in which the subcontractor "intended, not to make a firm bid, but only to give the plaintiff 'some kind of an idea to use' in making its bid," *Drennan*, 333 P.2d at 761, and concluded that in that case "[t]here was thus no offer, promise, or representation on which the defendants should reasonably have expected the plaintiff to rely." *Id.* (citing *Leo F. Piazza Paving Co. v. Bebek &*

*Brkich*, 141 Cal.App.2d 226, 296 P.2d 368 (1956)).

**10.** Even the plaintiff has not attempted to argue that its request of written confirmation was a form of acceptance; all oral quotes were asked to be confirmed in this way, and Bud Hancock lacked the authority to bind Foley to Warren in any event.

ceptance ... in the hope of getting a better price." *Drennan*, 333 P.2d at 760.

## CONCLUSION

After careful review of the testimony, the documentary evidence, and the arguments of counsel, the court concludes that the plaintiff has failed to meet its burden of proving that Warren made a promise on August 28 upon which it should reasonably have expected Foley to rely. Accordingly, the court directs the clerk to enter judgment in favor of the defendant Warren Engineering, Inc.

IT IS SO ORDERED.