**APAC–SOUTHEAST, INC., Plaintiff,**

v.

**COASTAL CAISSON CORP., Defendant.**

**Civ. A. No. 1:06–cv–848–TCB.**

United States District Court, N.D. Georgia, Atlanta Division.

Sept. 20, 2007.

David M. Toolan, APAC, Inc., Atlanta, GA, Mason Craig Hall, Law Office of M. Craig Hall, LLC, Dunwoody, GA, for Plaintiff.

Donald E. Hemke, Carlton Fields Ward Emmanuel Smith & Cutler, Tampa, FL, Philip S. Bubb, Carlton Fields, PA, Atlanta, GA, for Defendant.

## *ORDER*

TIMOTHY C. BATTEN, Sr., District Judge.

Plaintiff APAC–Southeast, Inc. submitted the winning bid to the Georgia Department of Transportation ("GDOT") to serve as the general contractor for the construction of the Perimeter Center Parkway Extension in DeKalb County. Included in APAC's winning bid was Defendant Coastal Caisson Corp.'s proposal to perform drilled-shaft foundation [1] subcontract work on the project. After the GDOT awarded APAC the prime contract and APAC called upon Coastal to fulfill its proposal, however, Coastal refused to perform the work.

In this action, APAC alleges promissory estoppel against Coastal, claiming that APAC reasonably relied on the bid and that Coastal wrongfully refused to honor it. APAC also alleges that the parties later entered into an oral contract that Coastal breached. APAC seeks an award of actual damages plus punitive damages and litigation expenses as a result of Coastal's having acted in bad faith and been stubbornly litigious. The case is now before the Court on Coastal's motion for summary judgment.

---

1. This specialized type of construction is one method used to build bridge foundations.

## I. Facts

APAC is a general contractor employed in heavy highway and bridge construction. Coastal is a specialty contractor engaged in the installation of drilled-shaft foundations for bridges.

In early 2005, the GDOT solicited bids from general contractors for the construction of the parkway extension project. On January 12, 2005, in preparation for its bid to become general contractor, APAC solicited bids from subcontractors. On January 19, Coastal submitted to APAC its proposal for the drilled-shaft foundation subcontract work on the project. APAC incorporated Coastal's proposal into its bid to serve as the prime contractor for the project.

In early February 2005, the GDOT awarded the prime contract to APAC, and on February 15, 2005, APAC faxed to Coastal a letter of intent to subcontract for the drilled-shaft foundation work. On March 1, 2005, APAC signed the prime contract with the GDOT for the project.

On April 15, 2005, APAC sent Coastal a proposed subcontract, which Coastal received on April 18. The proposed subcontract was a standard subcontract form commonly used by APAC that had been edited to include information regarding the scope of the drilled-shaft foundation work.

Several terms of the proposed subcontract varied from the language of Coastal's bid, particularly with regard to distribution of risk. Coastal's bid included standby rates that would be owed to Coastal in the event of a delay, and it excluded incremental costs that might be incurred as a result of unanticipated subsurface conditions. APAC's proposed subcontract, however, assigned both of those risks to Coastal.

Between April and August 2005, Coastal's representatives worked with APAC's representatives to coordinate the construction schedule. By July 13, 2005, APAC had not received a response from Coastal regarding APAC's proposed subcontract, so Penny Wilson, APAC's contract manager, attempted to reach her management contacts there. She was able to reach only a secretary. She left several messages between July 13 and July 19. When she called again on July 20, she was told that her contacts at Coastal were no longer with the company.

In August 2005, Charles Puccini, Coastal's president, read APAC's proposed subcontract, and on August 3, he contacted APAC to voice his concerns about it. In response, APAC invited Puccini and other Coastal representatives to its Atlanta office to work out the details of the subcontract, to determine a mobilization date, and to visit the jobsite.

At 10:00 a.m. on August 11, Puccini and Jeffrey Wilkes, one of Coastal's project managers, met with a number of APAC's staff members, including vice president Nate Marini. In the course of that meeting, Marini and Puccini went through the terms and conditions of APAC's proposed subcontract, line by line, noting changes to be made. After the meeting, they went to the jobsite, where they discussed the steps APAC would need to take in order to provide an accessible and stable worksite to Coastal. Puccini stated that Coastal could have a crew available within two to six weeks, and he provided a work schedule. By the end of the meeting, Marini agreed to make all of Puccini's requested changes and promised to send a revised subcontract to Coastal. Marini and Puccini shook hands and said they looked forward to working together.[2]

2. Coastal's facts regarding this meeting differ significantly from APAC's. APAC representa-

tives testified that the parties met only that

That same afternoon, Marini brought Wilson the edits he and Puccini had discussed that morning, and he had her issue a revised subcontract. APAC sent the revised subcontract to Coastal on August 12, 2005, and Coastal received it the next day.

On August 24, Wilson called Coastal to inquire about the status of the revised subcontract. Puccini told her that it was on his desk and that he would review it to ensure his changes had been made and would then get back with Marini.

On September 12, 2005—a month after the face-to-face subcontract meeting—Puccini sent a letter to Marini by which he purported to reject the revised subcontract and terminate the parties' business relationship.[3] APAC then re-bid the subcontract work and replaced Coastal with a new drilled-shaft foundation subcontractor. This process delayed the project by at least six months.

On February 24, 2006, APAC filed this action against Coastal in Georgia state court, which Coastal timely removed to this Court.

## II. Discussion

### A. Legal Standard

Summary judgment is proper when no genuine issue as to any material fact is present, and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The movant carries the initial burden and must show that there is

"an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991). The nonmovant is then required to "go beyond the pleadings" and present competent evidence in the form of affidavits, depositions, admissions, and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. "The mere existence of a scintilla of evidence" supporting the nonmovant's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Resolving all doubts in favor of the nonmoving party, the Court must determine "whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id.* If reasonable minds could differ as to the conclusion drawn from the evidence in the record, the motion for summary judgment should be denied. *Id.* at 251, 106 S.Ct. 2505.

### B. Analysis

#### 1. Promissory Estoppel

APAC argues that because it relied upon Coastal's subcontract bid in its prime

---

morning for the contract meeting and site visit. According to Coastal, however, APAC stopped the morning negotiations while there were still a number of unaddressed concerns and proposed finishing the contract discussion that afternoon after the site visit. Coastal contends that after the site visit, Puccini and Wilkes returned to APAC's office that afternoon and again met with Marini. Puccini characterized the conversation as argumentative. According to both Puccini and Wilkes, Marini ended their meeting at 5:00

p.m. in a rush, before negotiations were complete.

For the purposes of this motion, these factual discrepancies must be resolved in favor of APAC, the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

3. Puccini later testified that he did not notify APAC sooner because he was "disgusted" and "done talking to them."

GDOT bid, the theory of promissory estoppel applies to establish a contract between APAC and Coastal even though APAC submitted to Coastal a written subcontract proposing terms and conditions that differed from those in Coastal's bid. APAC alleges that Coastal knew both that it would be required to enter into APAC's form subcontract and that APAC's form subcontract would not mirror the terms and conditions of Coastal's bid. Therefore, according to APAC, because Coastal knew that APAC relied on its bid but never expected APAC to accept the bid unconditionally, unconditional acceptance was not a prerequisite to formation of an enforceable contract.

APAC further contends that tendering its form subcontract should be considered an acceptance because Coastal treated it as an acceptance until Coastal wanted an eleventh-hour escape from the project. APAC theorizes that Coastal's August 2005 "concerns" about the subcontract were artifice intended to enable Coastal to avoid performing the bid when it discovered that it had equipment scheduling problems or that its subcontract bid was too low. In support of this theory, APAC points out that Coastal's scheduling records from April through September 2005 indicate that Coastal planned to perform on the project and that no one at Coastal even read APAC's form subcontract until August of 2005, the month before Coastal was to begin performance. APAC further notes that Coastal's equipment records indicate that the drill used in Coastal's bid was committed to another site when it was needed for the GDOT project, and that Coastal's subcontract bid was the lowest

by $500,000. APAC likens these facts to those involved in *SKB Indus., Inc. v. Insite*, 250 Ga.App. 574, 551 S.E.2d 380 (2001), and concludes that because, as in *SKB*, a jury could conclude that the subcontractor refused to perform its bid for reasons unrelated to a contract language dispute,[4] a jury should be allowed to determine whether the doctrine of promissory estoppel should be applied to hold Coastal liable for refusing to perform its bid.

Coastal, in turn, argues that promissory estoppel kept its bid open only until APAC rejected it by responding with its form subcontract, which did not exactly mirror the terms and conditions of Coastal's bid. It contends that all the other facts APAC presents, even if true, are immaterial to APAC's promissory estoppel claim.

In cases where a subcontractor has submitted a bid to a general contractor for use in a prime bid, the prime contractor may invoke the theory of promissory estoppel in order to prevent the subcontractor from revoking its bid, despite the absence of an option supported by consideration or a bilateral contract binding the general contractor and the subcontractor. *Drennan v. Star Paving Co.*, 51 Cal.2d 409, 413–14, 333 P.2d 757, 759–60 (1958).[5] Instead, "a subcontractor who makes a bid to a general contractor binds itself to perform according to its promise because the general contractor has relied on that promise in making its own bid." *Foley Co. v. Warren Eng'g, Inc.*, 804 F.Supp. 1540, 1545 (N.D.Ga.1992) (construing *Drennan*, 51 Cal.2d at 413–14, 333 P.2d at 759–60).

---

4. In *SKB*, the court found the jury could have reasonably concluded that the subcontractor refused to perform because it mistakenly bid too low. *SKB Indus., Inc.*, 250 Ga.App. at 578, 551 S.E.2d at 384.

5. As recognized by this Court in *Foley Co. v. Warren Eng'g, Inc.*, 804 F.Supp. 1540, 1545 (N.D.Ga.1992), *Drennan* is the leading promissory estoppel case involving subcontractor bids. The case has also been cited by the Georgia Court of Appeals. *See SKB Indus., Inc.*, 250 Ga.App. at 576, 551 S.E.2d at 383.

Promissory estoppel operates to keep a subcontractor's bid open until the general contractor has had a reasonable opportunity to accept or reject it. *Drennan,* 51 Cal.2d at 415, 333 P.2d at 760; *see also Montgomery Indus. Int'l, Inc., v. Thomas Consfr. Co.,* 620 F.2d 91, 97 (5th Cir.1980).[6] It does not, however, allow the general contractor to "reopen bargaining with the subcontractor and at the same time claim a continuing right to accept the original offer." *Drennan,* 51 Cal.2d at 415, 333 P.2d at 760. "Unless the acceptance is unconditional and without variance from the offer it is of no legal effect as an acceptance and operates as a rejection and a counteroffer." *Peerless Cas. Co. v. Hous. Auth. of Hazelhurst,* 228 F.2d 376, 379 (5th Cir.1955) (former Fifth Circuit case applying Georgia law); *accord Duval & Co. v. Malcom,* 233 Ga. 784, 787, 214 S.E.2d 356, 358 (1975). The rejection and counteroffer terminates the offeree's power to accept the offer. *Gill v. B & R Int'l, Inc.,* 234 Ga.App. 528, 532, 507 S.E.2d 477, 481 (1998).

Assuming without deciding that APAC could prove the elements of a promissory estoppel claim,[7] the theory is inapplicable to this case because APAC forfeited its right to hold Coastal's bid open when it counteroffered with its form subcontract. As of April 15, 2005, Coastal's subcontract bid remained open. On that date, however, rather than accepting that bid, APAC asked Coastal to sign its form subcontract, which both parties agree differed from Coastal's proposal. Thus, APAC's response to Coastal's offer was not "unconditional" or "without variance" and therefore operated as a rejection and a counteroffer, which terminated APAC's power of acceptance. *See Peerless,* 228 F.2d at 379.

*SKB Indus., Inc. v. Insite,* 250 Ga.App. 574, 551 S.E.2d 380 (2001), relied upon by APAC, is inapposite. In *SKB,* a subcontractor provided a bid on which the general contractor relied in its bid for the primary contract. After the prime contractor won the bid and notified the subcontractor it was the low bidder, it forwarded the subcontractor a written subcontract. The subcontractor later refused to perform its bid, citing disputes over the language in the subcontract.

The difference between the case at bar and *SKB* is that in *SKB,* the contractor did not attempt to accept the bid simply by tendering a non-conforming written subcontract to the subcontractor; instead, it accepted the subcontractor's bid unconditionally and *then* submitted what *may* have been a non-conforming written subcontract.[8] By accepting the bid, the contractor preserved the promissory estoppel

---

6. The Eleventh Circuit has adopted as binding precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981. *See Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

7. To prevail in a promissory estoppel action, the plaintiff must prove that "(1) the defendant made certain promises; (2) the defendant should have expected the plaintiff to rely upon those promises; (3) the plaintiff did in fact rely upon those promises to its detriment; and (4) injustice can be avoided only by enforcement of the promise." *Foley,* 804 F.Supp. at 1544. "A 'promise' may be defined as a manifestation of an intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." *Id.* at 1544–45.

8. Upon determining that the owner was amenable to the subcontractor's specifications and receiving the subcontractor's assurances that it could fulfill its bid, the contractor "accepted [the subcontractor's] bid," at which time the subcontractor "became contractually obligated to perform...." *Id.* at 576, 551 S.E.2d at 383. The contractor then forwarded to the subcontractor the written subcontract.

claim, and that claim was not vitiated by a subsequent dispute over the terms of the proposed written agreement. Consequently, it was for the jury to determine whether the subcontractor's refusal to perform was based upon a genuine as opposed to pretextual dispute over the terms of the proposed written subcontract.

In contrast, by responding to Coastal's bid not with an acceptance but with a nonconforming proposed written subcontract, APAC rejected Coastal's bid, thereby terminating its ability to accept—and its ability to recover under promissory estoppel. *See Peerless*, 228 F.2d at 379; *Drennan*, 51 Cal.2d at 415, 333 P.2d at 760. The Court knows of no cases, and APAC presents none, that require a subcontractor to honor an offer after it was rejected by the prime contractor.

For these reasons, APAC's promissory estoppel claim fails as a matter of law, and the Court grants summary judgment on this claim to Coastal.

### 2. Breach of Oral Contract

APAC contends that the parties came to an enforceable oral agreement on August 11, 2005. APAC's evidence shows that on that date, Marini and Puccini met face-to-face in Atlanta and reviewed each line of the proposed subcontract together, with Marini agreeing to all of Puccini's requested changes. At the end of the meeting, Marini and Puccini shook hands and said they looked forward to working together. Marini expected to use his notes from the meeting simply to memorialize the agreement in writing, per APAC's corporate guidelines.

Georgia law requires four foundational elements for the formation of a valid contract: (1) parties able to contract, (2) consideration, (3) definite subject matter, and (4) "the assent of the parties to the terms of the contract." *Strait v. Reid*, 262 Ga.App. 430, 433, 585 S.E.2d 640, 642 (2003) (quoting O.C.G.A. § 13–3–1). Coastal does not dispute the first three elements, but contends that there was no meeting of the minds and thus no contract.

At the foundation of Coastal's argument that there was no meeting of the minds is its contention that both parties understood there could be no binding agreement without a writing. As proof that the parties never intended to form an oral contract, Coastal cites record evidence showing that Coastal's bid and APAC's proposed subcontracts always envisioned that any subcontract would be in writing; that the amount of the subcontract would be close to $800,000; that the proposed subcontract contained detailed terms and conditions; and that APAC's subcontractors always operated under written subcontracts.

Coastal then cites law from other jurisdictions to the effect that courts consistently consider five factors in determining whether an oral agreement is enforceable as a matter of law: "(1) whether the contract is one usually put in writing, (2) whether there are few or many details, (3) whether the amount involved is large or small, (4) whether it requires a formal writing for a full expression of the covenants and promises, and (5) whether the negotiations indicate that a written draft is contemplated as the final conclusion of negotiations." *See, e.g., Thompson v. Pike*, 122 Idaho 690, 696, 838 P.2d 293, 299 (1992); *accord R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 75 (2d Cir.1984) (affirming summary judgment on a breach of oral contract claim in part because in "complex and substantial business matters," written contracts are the norm and thus signal that the parties intended not to be bound without a written contract). Coastal argues that application of the foregoing principles to the facts of this case compels a finding that as a matter of law APAC and Coastal could not have reached

an enforceable agreement without a written contract.

Although Coastal's argument is somewhat compelling, it fails to directly address the legal question of whether, under Georgia law, the parties could possibly have entered into an enforceable oral agreement on August n, 2005. Coastal has not presented, and the Court has not found, any authority suggesting that Georgia has adopted the *Thompson v. Pike* test. The Court declines to adopt this analytical framework to defeat a claim when Georgia courts have yet to do so.

■■■ In Georgia, to preclude formation of an oral contract as a matter of law, a party must expressly require a writing. *Mason v. Rabun Waste, Inc.*, 174 Ga.App. 462, 463, 330 S.E.2d 400, 401 (1985) (affirming summary judgment for the plaintiff on its oral contract claim despite the defendant's uncommunicated intent that the final agreement would have to be in writing to be enforceable). Otherwise, whether a contract existed at all is a question of fact to be determined by a jury. *Terry Hunt Constr. Co. v. AON Risk Servs., Inc.*, 272 Ga.App. 547, 551, 613 S.E.2d 165, 168–69 (2005).

Furthermore, contrary to the five-part analytical framework Coastal presents, in Georgia even a complicated, expensive construction contract may be oral. *See Royal Mfg. Co. v. Denard & Moore Constr. Co.*, 137 Ga.App. 650, 650, 224 S.E.2d 770, 771 (1976) (holding that a contract to build an addition to a textile mill could be oral). Thus, under Georgia law, the evidence does not *demand* a finding that until the parties' alleged oral agreement was reduced to writing and signed, it could not be enforceable.

■■■ In evaluating a defendant's motion for summary judgment, it is not the Court's task to determine the plaintiff's likelihood of success at trial, but instead to decide whether the plaintiff cannot possibly succeed as a matter of law. *Anderson v. Liberty Lobby, Inc.*; 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Admittedly, APAC's burden of proving the existence of an enforceable oral agreement is high. *See Ga. Farm Bureau Mut. Ins. Co. v. Croley*, 263 Ga.App. 659, 661, 588 S.E.2d 840, 843 (2003) (noting that "the party claiming the existence of a contract has the burden of proving its existence and its terms" by "clear and convincing" evidence). Nevertheless, whether the parties established an oral contract is a factual question that will turn on the credibility of the witnesses, and the Court cannot say at this stage that it is impossible for APAC to provide clear and convincing evidence that the parties came to an oral agreement on August 11, 2005.

APAC contends that on August 11, 2005, the parties orally agreed to all the terms and conditions of the arrangement, shook on it, and planned simply to memorialize that agreement in writing. Coastal maintains that its representatives departed from APAC's offices that afternoon believing negotiations were ongoing and that both parties believed no contract could be formed without a signed written agreement. If the facts are as APAC presents them, the parties formed a contract; if they are as Coastal presents them, there was no agreement. Thus, a genuine issue of material fact remains, and this claim is not ripe for disposition by summary judgment.

### 3. Punitive Damages

■■■ APAC claims that Coastal acted in bad faith, entitling APAC to punitive damages under O.C.G.A. § 51–12–5.1. Punitive damages may be awarded under this statute only if the plaintiff prevails on an underlying tort claim. *Flynn v. Allstate Ins. Co.*, 268 Ga.App. 222, 222–23, 601 S.E.2d 739, 740 (2004). Because APAC's

action involves only contract claims, it cannot claim relief under § 51–12–5.1.

 "Generally, punitive damages are not recoverable for breach of contract, even though the breach may be in bad faith." *Parsells v. Orkin Exterminating Co.,* 172 Ga.App. 74, 76, 322 S.E.2d 91, 93 (1984) (citing O.C.G.A. § 13–6–10, which states that "[u]nless otherwise provided by law, exemplary damages shall never be allowed in cases arising on contracts"). Rarely, punitive damages may be imposed when the breach of contract involved an act of fraud. *Id.* "The five elements of fraud ... include: (1) a false representation made by the defendant; (2) scienter; (3) an intention to induce the plaintiff to act or refrain from acting in reliance by the plaintiff; (4) justifiable reliance by the plaintiff; and (5) damage to the plaintiff." *Id.* at 75, 322 S.E.2d at 93. APAC has failed to present evidence establishing a genuine issue of material fact on each of these elements.[9] Therefore the Court grants Coastal's motion for summary judgment on APAC's punitive damages claim.

### 4. Litigation Expenses

 However, the Court finds that there is a genuine issue of material fact with regard to APAC's claim for litigation expenses. The award of litigation expenses is allowed under O.C.G.A. § 13–6–11 only where the plaintiff proves that the defendant "has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense."

*David G. Brown, P.E., Inc. v. Kent,* 274 Ga. 849, 850, 561 S.E.2d 89, 90 (2002).[10]

 Recovery for stubborn litigiousness or unnecessary trouble is authorized only if there is "no bona fide controversy or dispute regarding liability for the underlying cause of action." *Id.* As noted above, the Court does find that a bona fide controversy exists as to whether an oral contract existed and was breached. Thus, to the extent APAC's litigation expenses claim is based upon these two grounds, Coastal is entitled to summary judgment thereon.

 Litigation costs may also be awarded in a breach of contract action, however, if the plaintiff proves that the contract was made in bad faith or that the defendant breached the contract as a result of "some interested or sinister motive." *Glen Rest., Inc. v. West,* 173 Ga. App. 204, 205, 325 S.E.2d 781, 782 (1984). The question of whether a contract existed and Coastal breached it in bad faith remains for the jury to decide, and the jury may determine both that there was a contract and that Coastal breached it for an interested motive such as scheduling or financial problems, as APAC suggests. Therefore, the Court denies Coastal's motion for summary judgment on APAC's claim for litigation expenses to the extent that claim is based upon the "bad faith" prong of O.C.G.A. § 13–6–11.

9. APAC claims that Coastal's expectation that APAC would accept its terms and conditions unconditionally was so unreasonable that Coastal's offer amounted to fraud. It cites no case law to support this assertion.

Alternatively, APAC theorizes that Coastal may have refused to perform because of a scheduling problem with its BG–30 drill rig or because Coastal had mistakenly underpriced its subcontract bid. APAC, however, does not argue that this—even if true—would

constitute fraud, and therefore the Court will presume that APAC presents this theory only to show bad faith in support of its claim for litigation expenses and not to support its punitive damages claim.

10. An award under § 13–6–11 must "relate to conduct arising from the underlying cause of action being litigated, not conduct during the course of the litigation itself." *Id.*

## III. Conclusion

For the foregoing reasons, the Court GRANTS in part and DENIES in part Defendant's motion for summary judgment [42].

IT IS SO ORDERED.